THIRD DIVISION
March 1, 2006

1-05-0719

| | | |
|---|---|---|
| ALEC SHARP, Individually and as Representative | ) | Appeal from the |
| of Certain Underwriters at Lloyd's, London, ) | | Circuit Court |
| FEDERAL INSURANCE COMPANY (UK), LTD.,) | | of Cook County. |
| ASSICURAZIONI GENERALI S.P.A., | ) | |
| GE FRANKONA REINSURANCE LTD., | ) | |
| All Subscribing to Policy No. QA9900096, | ) | |
| | ) | No. 01 CH 05697 |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. ) | | |
| | ) | |
| TRANS UNION L.L.C., | ) | Honorable |
| | ) | Philip L. Bronstein, |
| Defendant-Appellant. | ) | Judge Presiding. |

<u>MODIFIED UPON DENIAL OF REHEARING</u>

JUSTICE THEIS delivered the opinion of the court:

Defendant, Trans Union LLC, appeals pursuant to Supreme Court Rule 304(b)(5)

(Official Reports Advance Sheet No. 22 (October 26, 2005), R. 304(b)(5), eff. January 1, 2006)

from a contempt order entered by the circuit court of Cook County after Trans Union failed to

comply with an earlier order compelling it to produce certain documents requested by plaintiff,

Alec Sharp, individually and as representative of certain underwriters at Lloyd's of London (the

Underwriters). In that request, pursuant to Supreme Court Rule 214 (166 Ill. 2d R. 214), the

Underwriters sought documents relevant to their determination of whether certain class action

lawsuits filed against Trans Union would be excluded from coverage under Trans Union's $75

million professional liability insurance policy. Those documents included, *inter alia*, items

reflecting or pertaining to Trans Union's general counsel's knowledge of the Fair Credit

1-05-0719

Reporting Act (15 U.S.C. § 1681 *et seq*. (West 2006)) (the FCRA) and of Federal Trade

Commission (FTC) and private litigation arising from alleged violations of the FCRA

(collectively the pre-policy documents). Trans Union refused to turn the pre-policy documents

over to the Underwriters, claiming they were protected from disclosure by the attorney-client

privilege and the work product doctrine. The circuit court granted the Underwriters' motion to

compel the production of the pre-policy documents and, when Trans Union refused to comply,

held Trans Union in contempt of court.

On appeal, Trans Union contends that the circuit court erred in granting the Underwriters'

motion to compel Trans Union to produce the pre-policy documents. Trans Union alternatively

argues that even if production of the pre-policy documents was properly ordered, it should not

occur at this time because it will prejudice Trans Union's defense in the underlying lawsuits. For

the reasons that follow, we find that Trans Union bargained away any privilege against

disclosure applicable to the pre-policy documents when it agreed to a manuscripted insurance

policy, which defined coverage in terms of what Trans Union's general counsel knew about

existing and potential errors and omissions lawsuits.

The record discloses the following facts relevant to the determination of this appeal.

Trans Union is an international provider of consumer credit reporting services. As such, Trans

Union collects and maintains a massive database of consumer credit information. In the 1990's,

Trans Union was engaged in the business of selling prescreened lists of consumers to credit

grantors for target marketing purposes.

On December 15, 1992, the FTC filed an administrative complaint against Trans Union,

alleging that Trans Union violated the FCRA by selling consumer reports in the form of prescreened lists to third parties for improper purposes. An administrative law judge ultimately ruled that Trans Union violated the FCRA by selling the lists. However, Trans Union elected to appeal the FTC's decision and continued to sell the target marketing information. At the time the present action was filed, Trans Union was still pursuing appeals of the FTC's decision. Trans Union did not stop selling consumer information from its databases until roughly 2002.

On August 31, 1998, Joshua Frey filed a complaint against Trans Union in Orange County, California, based on allegations similar to those in the FTC complaint. The plaintiff alleged, *inter alia*, that Trans Union "sells the individual consumer information it collects * * * to third-parties who do not have a permissible purpose for obtaining or receiving the information * * * under the FCRA."

During this time, Trans Union decided to procure professional liability insurance coverage. Denise Norgle, Trans Union's assistant general counsel at the time, explained in her deposition that she was involved in the discussions leading to the decision. However, the only factor that Norgle could recall in the decision was that Trans Union had been involved in contract negotiations with some "very large customers," who would have required Trans Union to obtain errors and omissions insurance. Norgle would not answer questions regarding whether Trans Union suspected that there would be future lawsuits based on the sale of consumer information to third parties without proper purposes under the FCRA. Norgle would also not answer questions about whether Trans Union believed that such future suits would be covered under a professional liability insurance policy.

Accordingly, on October 13, 1998, Trans Union submitted an application for professional liability insurance with its broker, Aon Risk Services, Inc. In that application, Trans Union indicated that there were "various consumer claims pending against it that have been brought for alleged violations of federal and state consumer reporting laws." However, the FTC and Frey lawsuits were not listed among the suits disclosed at that time.

Through Aon, negotiations to insure Trans Union began with the Alec Sharp Syndicate at Lloyd's of London. Andrew Syson, the Sharp Syndicate's commercial professional indemnity underwriter at the time, further explained this process in his deposition. Although Syson was not familiar with Trans Union's application, he explained generally that someone at the Sharp Syndicate would have reviewed the application and the claims history before underwriting the policy. Frequently, underwriters request more information on pending claims.

Terms of policies are then established by negotiation. The wording of the policy might begin with a more standard language, but would be altered during the negotiation process. Regarding the policy at issue in the case at bar, Syson identified a number of changes that were made to the language of the policy during the negotiation process. Among them, the language of exclusion (g) of the policy was changed from excluding:

"any Claim arising out of acts, errors, violations or omissions that took place prior

to the effective date of this Insurance, if the Chief Financial Officer of the Named

Assured on the effective date knew *or could reasonably have foreseen* that such

acts, errors, violations or omissions might be expected to be the basis of a Claim"

(emphasis added)

4

to excluding claims only if the chief financial officer on the effective date "*knew* that such acts, errors, violations or omissions might be expected to be the basis of a Claim."  (Emphasis added.)

Stuart Essex, Aon's United Kingdom broker, also discussed the negotiation of the policy language in his deposition.  Essex stated that he had never worked on an account that required so many changes to the policy language, observing that this was "one of the worst cases I have seen for required amendments."  Essex also indicated that Aon was concerned they were "killing the policy with too many attempts to amend the policy language."

The process of negotiating Trans Union's policy took months, and Aon wanted the coverage in place by June 10, 1999.  Accordingly, on April 9, 1999, Essex sent an e-mail to Mary Gander at Aon expressing his concerns that an agreement regarding the policy might not be reached.  Essex also requested a "no known loss" letter, which would indicate that since Trans Union submitted its application, no further known claims had been filed.  According to Syson, it was quite common for Lloyd's policies to be bound contingent upon an updated loss letter being received at a later date.

The Underwriters ultimately issued a $75 million claims made professional liability policy to Trans Union on June 16, 1999.  Thereafter, on July 13, 1999, Trans Union submitted a letter disclosing the FTC litigation, the Frey suit, and two additional consumer suits which had been filed since its application was submitted.  The first additional suit was filed by Marci Martinelli in California on January 28, 1999.  The second additional suit was filed by Michael Rosen in California on February 11, 1999.  Like the FTC litigation and the Frey suit, the Martinelli and Rosen suits were based on, *inter alia*, allegations that Trans Union improperly

sold consumer information to third parties in violation of the FCRA.

When the Underwriters received notice of these claims, Essex wrote an e-mail to Mary Gander that "large eyebrows were raised." However, the Underwriters did not change their decision to insure Trans Union. Essex also noted that because the policy excluded claims made prior to the inception of the policy, these claims would not be covered.

At its inception on June 16, 1999, the policy included the following relevant provisions. The policy covered only those claims "first made against any Assured during the Period of Insurance." The policy also contained certain specific exclusions. Among them was exclusion (g), which excluded:

> "any Claim arising out of acts, errors, violations or omissions that took place prior to the effective date of this Insurance, if the Chief Financial Officer of the Named Assured on the effective date knew that such acts, errors, violations or omissions might be expected to be the basis of a Claim."

The policy further provided:

> "All Claims arising out of the same, continuing or related Professional Services shall be considered a single Claim and deemed to have been made at the time of the first of the related claims is reported to the Underwriters and shall be subject to one Limit of Liability."

The policy included a cooperation clause, requiring:

> "The Assured shall co-operate with the Underwriters in all investigations, including investigations regarding the application and coverage under this Policy

* * *."

After the policy was issued, and the Underwriters learned of the pre- and post-policy suits, the policy was modified several times. Among those modifications, on September 19, 2000, the term "Chief Financial Officer" was changed to "General Counsel."

Beginning on September 19, 1999, 14 more consumer lawsuits were filed against Trans Union. Each of these suits was based on, *inter alia*, allegations that Trans Union improperly sold consumer information to third parties in violation of the FCRA. These lawsuits were subsequently consolidated and are currently pending before the Federal Multi-District Litigation Panel.

On April 2, 2001, the Underwriters initiated the present action by filing a complaint for declaratory judgment in the circuit court. Therein, the Underwriters sought a declaratory judgment that the 14 consumer lawsuits filed after the inception of the policy were not covered. In Count I, the Underwriters sought a declaration that all of the consumer suits arose out of the same allegations and causes of action; therefore, they constituted one "claim" within the meaning of the policy. In Count II, the Underwriters sought a declaration that the 14 post-policy claims were based on the same acts, errors, violations and omissions that were known of prior to the inception of the policy because they were based on the same allegations as the pre-policy suits. In Count III, the Underwriters sought a declaration that under the common law known loss doctrine articulated in Outboard Marine Corp. v. Liberty Mutual Insurance Co., 154 Ill. 2d 90, 607 N.E.2d 1204 (1992), the insured purchased the policy with reason to know that it will suffer or has already suffered a loss; therefore, the loss is uninsurable under the policy. Finally, in

Count IV, the Underwriters sought a declaration that the policy's other terms and exclusions limited or excluded coverage.

During the discovery process, on March 6, 2002, the Underwriters served Trans Union with a Supreme Court Rule 214 (166 Ill. 2d R. 214) request for production of documents. In that request, the Underwriters sought all documents related to the pre- and post-policy lawsuits, and all documents related to the drafting and negotiation of the policy. Trans Union refused to turn over a number of these documents, citing the attorney-client privilege and the work product doctrine.

On January 12, 2004, the Underwriters filed a motion to compel Trans Union to produce, *inter alia*, conversations and statements made by or to Trans Union's corporate and outside counsel, and documents contained in the files of Trans Union's defense counsel in the FTC and other lawsuits. The Underwriters claimed that the 14 post-policy suits were excluded from coverage by exclusion (g) of the policy, which excludes errors and omissions that Trans Union's general counsel knew might be expected to be the basis of a claim. The Underwriters further claimed that the attorney-client privilege and the work product doctrine were inapplicable to the documents in question under the supreme court's holding in Waste Management, Inc. v. International Surplus Lines Insurance Co., 144 Ill. 2d 178, 579 N.E.2d 322 (1991).

The court held a hearing on the Underwriters' motion to compel on March 25, 2004, and issued a number of pronouncements regarding the scope of the discovery. Notably, the court indicated that the Underwriters were "entitled to get into general counsel's thought processes or estimations because that's part of the coverage," so long as it was relevant to the question of

risks. However, the court made no ruling on the motion to compel at that time. Rather, it expressed concern that the discovery requests were very broad and categorical, and directed the Underwriters to narrow their request.

Trans Union subsequently produced a 251-page privilege log. On July 22, 2004, the Underwriters wrote to Trans Union and requested certain documents from the log. On August 6, 2004, Trans Union responded that it would not produce the requested documents, citing the attorney-client privilege and the work product doctrine.

Accordingly, on August 11, 2004, the Underwriters filed a second motion to compel Trans Union to produce the documents. This time, the Underwriters narrowed their request to four categories of documents: (1) pre-policy documents that reflect, potentially reflect, or pertain to Trans Union's and/or its general counsel's knowledge and/or analysis of the FCRA, the FTC litigation, and private litigation arising from the same allegations as the FTC litigation; (2) documents relating to Trans Union's attempts to settle the Martinelli litigation; (3) documents that appear to reflect database research, and (4) documents related to losses alleged by Trans Union, which Trans Union claimed eroded a self-insured retention in the policy. The Underwriters attached a color-coded display of the privilege log indicating which documents fell into which category.

On November 8, 2004, the court conducted a hearing on the Underwriters' second motion to compel. The court found that there was a duty to cooperate under the policy, which included the duty to disclose pre-policy matters. The court thus concluded that "the cooperation clause trumps the privilege in relevant areas," and ordered Trans Union to produce the first category of

requested documents, which included items communicated by or to Trans Union's general counsel relating to the FTC proceedings or the pre-policy suits. As to the other three categories, the court indicated that they were still too broad and encouraged the parties to narrow the request through further discovery.

Subsequently, on February 5, 2005, the parties stipulated to a protective order, agreeing that they could keep certain discovery materials confidential. This order limited access to these materials to the parties to the present case, their attorneys, their witnesses, and the court.

Ultimately, Trans Union moved for the entry of a contempt order solely for the purpose of permitting it to immediately appeal the order requiring it to turn over the documents in question. The court granted the order on February 9, 2005, and fined Trans Union $1 for its noncompliance. Trans Union timely filed a notice of appeal from that order pursuant to Supreme Court Rule 304(b)(5) (Official Reports Advance Sheet No. 22 (October 26, 2005), R. 304(b)(5), eff. January 1, 2006) on March 8, 2005.

In this appeal, Trans Union contends that the circuit court erred when it ordered Trans Union to produce the pre-policy documents because the documents were protected from disclosure by the attorney-client privilege and the holding of Waste Management does not, and should not, apply to pre-policy materials. The Underwriters respond that the manuscripted cooperation clause of the insurance contract, read together with exclusion (g) of the policy and the rationale of Waste Management, requires Trans Union to produce the pre-policy documents.

"'The purpose of the attorney-client privilege is to encourage and promote full and frank consultation between a client and legal advisor by removing the fear of compelled disclosure of

10

information.'" Waste Management, 144 Ill. 2d at 190, 579 N.E.2d at 326-27, quoting

Consolidation Coal Co. v. Bucyrus-Erie Co., 89 Ill. 2d 103, 117-18, 432 N.E.2d 250, 256 (1982).

However, the privilege against disclosure is the exception, rather than the rule. Waste

Management, 144 Ill. 2d at 190, 579 N.E.2d at 327. Thus, the privilege should be strictly

confined within its narrowest possible limits. Waste Management, 144 Ill. 2d at 190, 579 N.E.2d

at 327. In the context of the relationship between insurer and insured, Illinois "adhere[s] to a

strong policy of encouraging disclosure, with an eye toward ascertaining that truth which is

essential to the proper disposition of a lawsuit." Waste Management, 144 Ill. 2d at 190, 579

N.E.2d at 327.

The scope of the relationship between an insurer and an insured is defined and controlled

by the insurance policy. Waste Management, 144 Ill. 2d at 191, 579 N.E.2d at 327. Because

insurance policies are contracts, the rules of contract interpretation apply to them as they would

to any other type of contract. Hobbs v. Hartford Insurance Co., 214 Ill. 2d 11, 17, 823 N.E.2d

561, 564 (2005); Silverman v. Economy Fire & Casualty Co., 272 Ill. App. 3d 490, 492, 650

N.E.2d 603, 604 (1995). Thus, the court's primary objective in interpreting an insurance policy

is to ascertain and give effect to the intention of the parties, as expressed in the policy language.

Hobbs, 214 Ill. 2d at 17, 823 N.E.2d at 604. To do so, the court must examine the entire

document, considering the plain language of the policy as well as its subject matter and purpose.

Silverman, 272 Ill. App. 3d at 492, 650 N.E.2d at 604. The court may look to extrinsic

materials only where the policy's language is ambiguous. Harrington v. American Family

Mutual Insurance Co., 332 Ill. App. 3d 385, 389, 773 N.E.2d 98, 101 (2002). If the policy

11

language is unambiguous, the policy will be applied as written, provided that it does not contravene public policy. Hobbs, 214 Ill. 2d at 17, 823 N.E.2d at 604.

In Waste Management, the supreme court applied all of the above principles and held that neither the attorney-client privilege nor the work product doctrine applied to documents created in defense of two previously-settled lawsuits in a subsequent coverage dispute regarding one of the suits. Waste Management, 144 Ill. 2d at 188, 579 N.E.2d at 325-26. In so holding, the court determined that the parties' duties arising under the insurance contract did not end when the underlying litigation settled, but continued for as long as the insured sought to enforce the policy's terms. Waste Management, 144 Ill. 2d at 192, 579 N.E.2d at 328. The court's holding was based in large part upon its interpretation of the language of the parties' insurance contract. The policy at issue in that case contained a cooperation clause that imposed a broad duty of cooperation upon the insured, which was without limitation or qualification and required the insured to "'give all such information and assistance as the insurers may reasonably require.'" Waste Management, 144 Ill. 2d at 192, 579 N.E.2d at 327-28. The court emphasized that "[a]ny condition in the policy requiring cooperation on the part of the insured is one of great importance." Waste Management, 144 Ill. 2d at 191, 579 N.E.2d at 327. Further, the court observed that the purpose of a cooperation clause is to protect the insurer's interests from fraud. Waste Management, 144 Ill. 2d at 191, 579 N.E.2d at 327. Thus, the court read the broad, unlimited, unqualified duty of cooperation imposed by the parties' insurance contract as requiring the insured to disclose the information to the insurer. Waste Management, 144 Ill. 2d at 191-92, 579 N.E.2d at 327-28.

12

1-05-0719

Unlike the documents at issue in <u>Waste Management</u>, the documents in question here were created prior to the inception of the policy; nevertheless, we find the supreme court's decision in that case to be instructive. The broad policies articulated by the supreme court in <u>Waste Management</u> are equally applicable to our interpretation of the insurance contract at issue here. Our application of principles of contract interpretation and the policies articulated in <u>Waste Management</u> reveals that the parties' manuscripted insurance policy was negotiated and written to require the disclosure of Trans Union's general counsel's knowledge, work product, and communications regarding the pre-policy litigation.

Exclusion (g) of the policy, read together with the policy's cooperation clause, requires that items communicated by or to Trans Union's general counsel relating to the FTC proceedings or the pre-policy suits be turned over. The language of exclusion (g) is not ambiguous. The only possible meaning of it, or intent behind it, is to exclude from coverage any claim based upon an act, error, violation, or omission that Trans Union's general counsel knew could be the basis of a future claim. Exclusion (g) thus protects the Underwriters from insuring a known loss. See, <u>e.g.</u>, <u>Outboard Marine</u>, 154 Ill. 2d at 103, 607 N.E.2d at 1210. The policy effectively defines known losses in terms of the general counsel's knowledge by excluding errors and omissions that Trans Union's general counsel knew might be the basis of a future claim. The only way to determine whether Trans Union's general counsel knew that a particular act might be the basis of a claim would be to look at the general counsel's legal reasoning and analysis of that act.

Further, as noted above, the broad cooperation clause of the policy requires Trans Union to cooperate "in all investigations, including investigations regarding coverage." The parties

13

have not cited, nor has this court found, a case dealing with a cooperation clause with similar language specifically requiring cooperation in coverage investigations. Cf. Waste Management, 144 Ill. 2d at 192, 579 N.E.2d at 327-28 (cooperation clause required insured to "'give all such information and assistance as the insurers may reasonably require,'" but made no mention of coverage); State v. Hydrite Chemical Co., 220 Wis. 2d 51, 72, 582 N.W.2d 411, 420 (App. Ct. 1998) (cooperation clause required insured to "cooperate with the [insurance] company" in suits, but made no mention of coverage); Bituminous Casualty Corp. v. Tonka Corp., 140 F.R.D. 381, 386 (D. Minn. 1992) (cooperation clause did not mention coverage investigations, and court held a cooperation clause would not effect a waiver of attorney-client privilege absent an expressed intent to do so).

Reading the specific language of the cooperation clause together with exclusion (g), we find that Trans Union agreed to share the legal reasoning and analysis of its general counsel regarding whether there might be future claims based on its sale of target marketing information with the Underwriters in a coverage investigation. Although such information may be privileged because it is legal advice given by the general counsel to the corporation about whether its actions could result in liability (see, e.g., Fischel & Kahn, Ltd. v. van Straaten Gallery, Inc., 189 Ill. 2d 579, 584, 727 N.E.2d 240, 243 (2000)), Trans Union, in agreeing to a policy with such particular language, has agreed to share this information with the Underwriters under these circumstances.

This reading of the insurance contract is further supported by Illinois public policy. As the supreme court explained in Waste Management, there is a strong public policy in Illinois of

14

encouraging disclosure between insurer and insured, "with an eye toward ascertaining that truth which is essential to the proper disposition of a lawsuit." Waste Management, 144 Ill. 2d at 190, 579 N.E.2d at 327. Part of the reason for this duty of disclosure is to prevent the insured from committing fraud upon the insurer. See Waste Management, 144 Ill. 2d at 191, 579 N.E.2d at 327. The supreme court has also emphasized that the purpose of an insurance contract is to protect the insured "'against loss, damage, or liability arising from an *unknown or contingent event* and is applicable only to *some contingency or act to occur in [the] future*.'" (Emphasis in original.) Outboard Marine, 154 Ill. 2d at 103, 607 N.E.2d at 1210, quoting Black's Law Dictionary 721 (5th ed. 1979). If the insured knows that a loss will occur, it is not a contingency and would not be covered under an insurance contract absent an express agreement to do so. Outboard Marine, 154 Ill. 2d at 103-04, 607 N.E.2d at 1210. Thus, public policy would favor requiring an insured to share information with its insurer that would reveal whether a risk was known. The provisions of the insurance contract between the Underwriters and Trans Union promote these policies by requiring Trans Union to share information regarding whether its general counsel knew of particular losses. Accordingly, public policy supports enforcing the policy as written.

Although Trans Union claims that the insurance contract provisions at issue were "boilerplate" provisions that appear in "virtually all liability insurance policies," and that there is no evidence showing that either party understood exclusion (g) to effect a waiver of privilege, Trans Union's claims are belied by the record. The record discloses that Trans Union is an international, billion-dollar corporation, which had retained a law firm and Aon Risk Services to

broker and negotiate an insurance policy at Lloyd's of London. The policy was specifically tailored to Trans Union's situation by the Underwriters. This process took months and included various modifications to numerous provisions. Exclusion (g) was modified at least twice. The second time, the modification replaced "Chief Financial Officer" with "General Counsel." Although most insurance contracts are contracts of adhesion – standard form documents created by one party with far more bargaining power than the other party (see, e.g., Avery v. State Farm Mutual Automobile Insurance Co., 216 Ill. 2d 100, 218-19, 835 N.E.2d 801, 871-72 (2005) (observing that an individual's auto insurance policy is a contract of adhesion and declining to strictly enforce certain terms)) – that is certainly not the case here. Accordingly, we will hold the parties to their bargain.

Trans Union alternatively asserts that even if the policy requires production of the pre-policy documents, this court should nevertheless decline to enter an order requiring the production at this time. Trans Union maintains disclosure of these documents may prejudice Trans Union's defense in the underlying lawsuits by revealing information that the plaintiffs in the those suits could attempt to obtain and use to support their claims that Trans Union willfully, rather than negligently, violated the FCRA. Trans Union does not contend that the pre-policy documents do contain any information that would support a wilfulness argument. This court expresses no opinion regarding whether the pre-policy documents would support such claims.

In support of this contention, Trans Union relies upon the Fourth District's ruling in State Farm Fire & Casualty Co. v. Leverton, 289 Ill. App. 3d 855, 683 N.E.2d 476 (1997). In Leverton, the insurer sought a declaratory judgment that the insured had acted intentionally in

16

striking another man with a beer bottle and that, therefore, the victim's injuries were excluded from coverage under the insured's homeowner's insurance policy. Leverton, 289 Ill. App. 3d at 855-56, 683 N.E.2d at 477. The appellate court held that the circuit court should not have ruled on whether the insured had acted negligently or intentionally in the declaratory judgment action because the same issue was the subject of a personal injury suit filed by the victim, and to resolve that issue in the declaratory judgment action would have been to prematurely resolve the personal injury suit. Leverton, 289 Ill. App. 3d at 856, 683 N.E.2d at 478.

Although we adhere to the fundamental point relied upon in Leverton, which was first articulated by the supreme court in Maryland Casualty Co. v. Peppers, 64 Ill. 2d 187, 197, 355 N.E.2d 24, 30 (1976), that an issue of ultimate fact upon which recovery would be based in a suit for damages should not be adjudicated in a derivative declaratory judgment action regarding insurance coverage, we find it inapplicable to the present scenario. Here, the court is not being asked to determine whether Trans Union negligently or willfully violated the FCRA; the court is being asked to determine whether Trans Union must produce certain documents, which may or may not show whether Trans Union's general counsel "knew" that certain of its actions "might be expected to be" the basis of a future claim. This determination does not resolve the ultimate issue of fact to be adjudicated in the 14 underlying lawsuits. Accordingly, we reject Trans Union's contention that the production of the pre-policy documents should not be compelled at this time.

Moreover, the Underwriters have offered to execute a confidentiality agreement and/or stipulate to a protective order regarding any documents that Trans Union would like to protect

1-05-0719

from the plaintiffs in the underlying cases. Therefore, we find it appropriate to affirm the judgment of the circuit court granting the Underwriter's motion to compel, but remand with directions for the circuit court to fashion, with input from the parties, and enter an appropriate protective order under Supreme Court Rule 201(c)(1) (Official Reports Advance Sheet No. 8 (April 17, 2002), R. 201(c)(1), eff. July 1, 2002) to shield the pre-policy documents from disclosure to anyone other than the essential parties to the determination of this declaratory judgment action. We accordingly vacate the circuit court's February 9, 2005 order holding Trans Union in contempt of court, which was entered solely for the purpose of permitting Trans Union to immediately appeal the order on the motion to compel. See, e.g., Tomczak v. Ingalls Memorial Hospital, 359 Ill. App. 3d 448, 457-58, 834 N.E.2d 549, 557 (2005).

Affirmed in part; vacated in part; cause remanded with directions.

HOFFMAN, P.J., and ERICKSON, J., concur.

18

ALEC SHARP, Individually and as Representativeof Certain Underwriters at Lloyd's, London, FEDERAL INSURANCE COMPANY (UK), LTD., ASSICURAZIONI GENERALI S.P.A., GE FRANKONA REINSURANCE LTD., All Subscribing to Policy No. QA9900096,

      Plaintiffs-Appellees,

      v.

TRANS UNION L.L.C.,

      Defendant-Appellant.

## No. 1-05-0719

**Appellate Court of Illinois**
**First District, Third Division**

**Filed: March 1, 2006**

## JUSTICE THEIS delivered the opinion of the court.

**Hoffman, P.J., and Erickson, J., concur.**

**Appeal from the Circuit Court of Cook County**
**Honorable Philip L. Bronstein, Judge Presiding**

| For APPELLANT | Christopher C. Dickinson | Christopher F. Stoll |
|---|---|---|
| | Kathy A Karcher | Raymond H. Sheen |
| | Jenner & Block LLP | Heller Ehrman LLP |
| | One IBM Plaza | 333 Bush St. |
| | Chicago, IL 60611 | San Francisco, CA 94104 |

| For APPELLEE | David M. Holmes |
|---|---|
| | Stefan R. Dandelles |
| | Wilson, Elser, Moskowitz, Edelman & Dicker LLP |
| | 120 N. LaSalle St., Suite 2600 |
| | Chicago, IL 60602 |