2017 IL App (1st) 161465

No. 1-16-1465

Fifth Division
June 30, 2017

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

|  |  |  |
|---|---|---|
| MOTOROLA SOLUTIONS, INC., | ) | |
| | ) | |
|     Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ZURICH INSURANCE COMPANY; ASSOCIATED | ) | Appeal from the Circuit Court |
| INDEMNITY CORPORATION; CONTINENTAL | ) | of Cook County. |
| CASUALTY COMPANY; NATIONAL FIRE | ) | |
| INSURANCE COMPANY OF HARTFORD; | ) | No. 11 L 001902 |
| TRANSPORTATION INSURANCE COMPANY; | ) | |
| AMERICAN CASUALTY INSURANCE COMPANY | ) | The Honorable |
| OF READING, PENNSYLVANIA; LIBERTY | ) | Margaret A. Brennan, |
| MUTUAL FIRE INSURANCE COMPANY; and | ) | Judge Presiding. |
| LIBERTY INSURANCE COMPANY, | ) | |
| | ) | |
|     Defendants | ) | |
| | ) | |
| (Zurich Insurance Company and Associated Indemnity | ) | |
| Corporation, | ) | |
|     Defendants-Appellees). | ) | |
| | ) | |

_____

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justice Hall concurred in the judgment and opinion.
Justice Lampkin's dissent or concurrence will be filed at a future date.

**OPINION**

¶ 1      The instant appeal arises from a discovery dispute between plaintiff Motorola Solutions,

Inc., and defendants Zurich Insurance Company (Zurich) and Associated Indemnity

Corporation (Associated) concerning the production of documents that plaintiff claims are privileged. The parties are engaged in insurance coverage litigation, stemming from several underlying personal injury actions in which claims were asserted against plaintiff. Plaintiff filed a motion for summary judgment with respect to Zurich's duty to defend one of the actions and the trial court stayed briefing on the motion to permit limited discovery concerning a late notice defense asserted by defendants. As part of discovery, defendants sought the production of several documents that plaintiff claimed were privileged. The trial court ordered plaintiff to turn over the documents, and plaintiff refused. The trial court then held plaintiff in friendly civil contempt to permit plaintiff to appeal. For the reasons that follow, we reverse the trial court's order requiring production of the documents and vacate the friendly contempt order.

¶ 2                                                    BACKGROUND

¶ 3        We note that the parties' briefs and portions of the record on appeal were permitted to be filed under seal. While we respect the parties' wishes to keep confidential material private, our consideration of the issues on appeal necessarily requires us to discuss details of some of these documents. However, we include only those details necessary to our resolution of the issues on appeal.

¶ 4        The instant appeal is the third time the parties have been before this court with respect to the insurance coverage litigation: we considered the scope of releases executed by the parties in *Motorola Solutions, Inc. v. Zurich Insurance Co.*, 2015 IL App (1st) 131529, and considered underlying plaintiffs' requests to intervene in *Motorola Solutions, Inc. v. Continental Casualty Co.*, 2015 IL App (1st) 131724-U. To the extent that these earlier

decisions discuss facts that are helpful to our understanding of the issues in the instant appeal, we repeat them here.

¶ 5        On February 18, 2011, plaintiff filed a complaint for declaratory judgment and breach of contract against a number of insurance companies, including Zurich and Associated; the complaint was amended on July 1, 2011, and again on February 22, 2013. Plaintiff sought for the insurers to provide it legal representation to defend plaintiff and/or coverage for defense costs under insurance policies issued by each of the insurers for four underlying personal injury actions in which claims were asserted against plaintiff.

¶ 6        The four underlying actions (the clean room cases) alleged that plaintiff was liable for injuries that children of plaintiff's former employees and contractors allegedly sustained as a result of exposure to various chemicals in "clean rooms" in plaintiff's manufacturing facilities. According to plaintiff's complaint, from the 1960s through 2003, plaintiff operated facilities that manufactured, among other things, semiconductor products. These facilities included certain rooms that were designated as "clean rooms" in which the semiconductor products were manufactured, which "were designed to prevent dust and other similar materials from contacting semiconductor components during the manufacturing process." The clean room cases all involved substantially similar allegations, in general alleging that hazardous or toxic materials were present in the "clean rooms" and that "either the father, the mother, or both worked in [plaintiff's] clean room facility for some period of time before, and in a number of cases after, the [underlying] plaintiff child was born; often the period of employment [was] alleged to have continued through the *in utero* period. The [underlying] plaintiffs generally claim[ed] that the children were injured as a result of parents working in clean rooms" as a result of toxic exposure.

¶ 7    Plaintiff's complaint alleges that one or more of the insurer defendants had a duty to defend and/or pay defense costs in the clean room cases and that, by failing to do so, the insurers had breached their obligations to plaintiff under the insurance policies.

¶ 8    Both of the defendants in the instant appeal filed answers and affirmative defenses and included counterclaims in which they alleged that plaintiff had released all of its claims for coverage for the clean room cases in settlement agreements and releases that the parties had executed in 2003. The parties then engaged in litigation concerning the scope of the releases, which culminated in a bench trial on the issue in December 2012 and defendants' first appeal before this court in 2015, in which we affirmed the trial court's finding that the releases did not encompass the claims in the clean room cases. See *Motorola Solutions, Inc. v. Zurich Insurance Co.*, 2015 IL App (1st) 131529. During the pendency of the appeal, the trial court stayed all action in the coverage litigation. However, the underlying plaintiffs in one of the clean room cases sought to intervene in the coverage litigation in order to seek a modification of a protective order covering discovery that had been conducted concerning the scope of the releases. The trial court declined to assert jurisdiction on the motion to intervene in light of the order staying the proceedings, and the appeal of that order was the basis for our second decision in this matter. See *Motorola Solutions, Inc. v. Continental Casualty Co.*, 2015 IL App (1st) 131724-U.

¶ 9    According to plaintiff's brief, while the issue concerning the scope of the releases was being litigated, plaintiff was "effectively denied a defense" of the clean room cases "for several years." During that time, the underlying clean room cases were proceeding, and on September 3, 2015, plaintiff filed a motion for summary judgment against Zurich, seeking a

declaratory judgment regarding Zurich's duty to defend one of those underlying claims.[1] In response, Zurich filed a motion pursuant to Illinois Supreme Court Rule 191(b) (eff. Jan. 4, 2013), seeking leave to take discovery concerning the timeliness of plaintiff's notice to Zurich prior to responding to plaintiff's summary judgment motion. The trial court granted Zurich's motion on November 12, 2015, but ordered the parties to meet and confer about the scope of discovery and the entry of a protective order. The parties negotiated an agreed protective order, which the trial court entered on January 12, 2016.

¶ 10     The discovery sought by Zurich, later joined by Associated, included two categories of documents at issue on appeal. One consisted of documents pertaining to plaintiff's clean room safety program (CRSP documents). In the 1990s, a number of lawsuits had been filed against IBM, a competitor of plaintiff's, concerning alleged birth defects found in children whose parents worked in the manufacturing process in creating semiconductors in IBM's clean room facilities. According to plaintiff, "[plaintiff], as a prudent company also operating in that manufacturing sector, engaged counsel and formed a working group to conduct an analysis of [plaintiff's] practices in and risks arising from its clean rooms." This was known as plaintiff's "Clean Room Safety Program." The efforts of the program resulted in the creation of the CRSP documents in 1996, reports prepared by, or at the direction of, plaintiff's outside counsel. These CRSP documents had been sought by defendants since discovery began in the coverage litigation, with plaintiff withholding the documents on the basis of both the attorney-client privilege and the work product doctrine. Production of these documents has also previously been considered by this court on appeal, where we affirmed the trial court's finding that the CRSP documents were not relevant to the issue of

---

[1]According to the parties, the underlying claim has since been settled.

determining the scope of the releases in the first appeal. See *Motorola Solutions*, 2015 IL App (1st) 131529, ¶¶ 135-42. Documents concerning plaintiff's knowledge of the clean room risks are also of great interest to the underlying clean room plaintiffs, who sought to intervene during the pendency of the first appeal in order to obtain access to documents covered by a protective order.[2] See *Motorola Solutions*, 2015 IL App (1st) 131724-U, ¶ 3.

¶ 11 The second category of documents sought by defendants concerned plaintiff's 2003 sale of its semiconductor manufacturing business to a new entity, Freescale Semiconductor, Inc. In the course of that sale, plaintiff was required to file a United States Securities and Exchange Commission Form S-1 Registration Statement (S-1 documents). The form contains a section entitled "Risk Factors," which informs potential investors about "significant risk factors currently known and unique to" the seller of the securities. In this disclosure, plaintiff stated:

> "In the last few years, there has been increased media scrutiny and associated reports focusing on a potential link between working in semiconductor manufacturing clean room environments and certain illnesses, primarily different types of cancers *** Because we utilize these clean rooms, we may become subject to liability claims."

Defendants sought access to the documents related to the S-1 securities filing.

¶ 12 In response to defendants' discovery requests, plaintiff declined to produce the CRSP documents or the S-1 documents and, on January 20, 2016, defendants filed a motion to compel production of the documents. In the motion, defendants claimed that these documents were material evidence showing that plaintiff had been aware of the facts underlying the clean room actions since at least 1996 and that defendants intended to rely on this evidence to

---

[2]According to plaintiff, the underlying clean room plaintiffs again sought to intervene shortly after the trial court granted the Rule 191(b) motion for discovery but were again unsuccessful.

support their late notice defense. Defendants argued that under the Illinois Supreme Court case of *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178 (1991), the attorney-client privilege and work product doctrines did not apply to shield production of such documents from plaintiff's insurers. In its response, plaintiff contended that the CRSP documents were not prepared in connection with the defense of the clean room actions and that plaintiff did not learn until December 2007 that any individuals were considering pursuing any action against plaintiff, information which plaintiff promptly forwarded to its insurers.

¶ 13     On March 8, 2016, the trial court granted defendants' motion to compel, ordering plaintiff to produce:

"All documents comprising the CRSP Notebook, as identified on the privilege logs attached as Exhibits 2 and 17 to the Affidavit of Karen M. Dixon.

All communications to or from [plaintiff's] legal and/or risk management departments concerning the Clean Room Safety Program or any other assessments of [plaintiff's] potential liability for bodily injury claims arising out of the Clean Rooms and/or the Clean Room Chemicals, Substances and Radiation.

All documents in the possession of [plaintiff's] Corporate Insurance Department (a/k/a risk management) that refer in any way to the Clean Rooms.

All documents, including all communications with [plaintiff's] risk management or legal department, concerning the disclosure of potential clean room related liabilities to investors in *** December 2003 (the SEC S-1 Filing).

All documents/communications that refer in any way to potential clean room related claims and/or liabilities that were received, sent, or created by [plaintiff's]

7

legal and/or risk management departments prior to [plaintiff's] first notice to Associated/Zurich."

¶ 14    On March 29, 2016, plaintiff filed a motion for reconsideration or, in the alternative, for a finding of friendly contempt in order for plaintiff to appeal. On May 4, 2016, the trial court denied plaintiff's motion for reconsideration and found plaintiff in friendly contempt for refusing to comply with its discovery order, imposing a $100 penalty. This appeal follows.[3]

¶ 15                                  ANALYSIS

¶ 16    The instant appeal was filed pursuant to Illinois Supreme Court Rule 304(b)(5) (eff. Mar. 8, 2016), which permits an interlocutory appeal of "[a]n order finding a person or entity in contempt of court which imposes a monetary or other penalty." Here, the trial court found plaintiff in contempt of court and imposed a monetary penalty. Accordingly, we have jurisdiction to consider plaintiff's appeal. "Because discovery orders are not final orders, they are not ordinarily appealable." *Norskog v. Pfiel*, 197 Ill. 2d 60, 69 (2001). "However, it is well settled that the correctness of a discovery order may be tested through contempt proceedings." *Norskog*, 197 Ill. 2d at 69. "When [a party] appeals contempt sanctions imposed for violating, or threatening to violate, a pretrial discovery order, the discovery order is subject to review. [Citation.] Review of the contempt finding necessarily requires review of the order upon which it is based. [Citation.]" *Norskog*, 197 Ill. 2d at 69.

¶ 17    On appeal, plaintiff argues that the trial court erred in ordering it to produce the CRSP documents and the S-1 documents. We note that before the trial court, plaintiff argued that the documents were shielded by both the attorney-client privilege and the work product doctrine; however, on appeal, plaintiff focuses only on the attorney-client privilege, and

---

[3]We note that Associated did not file a separate brief on appeal but joined in and adopted Zurich's brief.

accordingly, we will do the same. "Although a trial court's discovery order is ordinarily reviewed for a manifest abuse of discretion [citation], the proper standard of review depends on the question that was answered in the trial court [citation]." *Norskog*, 197 Ill. 2d at 70. "If the facts are uncontroverted and the issue is the trial court's application of the law to the facts, a court of review may determine the correctness of the ruling independently of the trial court's judgment." *Norskog*, 197 Ill. 2d at 70-71. In the case at bar, the facts are uncontroverted and we are considering whether the trial court properly applied the law concerning privilege between an insured and its insurer to the uncontroverted facts. Accordingly, this is an issue of law that we review *de novo*. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 18                                    I. *Waste Management*

¶ 19        As the parties recognize, the primary case concerning this issue is our supreme court's decision in *Waste Management*. Accordingly, we must consider the case, and its holding, in considerable detail. In *Waste Management*, the insureds owned and operated a hazardous waste disposal site that was the subject of a lawsuit alleging that the insured was responsible for personal injury and property damage arising from the migration of toxic waste (the Miller litigation). *Waste Management*, 144 Ill. 2d at 186. During the pendency of the Miller litigation, the prior owners of the hazardous waste disposal site filed suit against the insureds and the insureds filed a counterclaim, alleging negligent design, construction, and operation of the site (the Nunn litigation). *Waste Management*, 144 Ill. 2d at 186. The insureds obtained a $10.675 million judgment in their favor against the prior owners in the Nunn litigation and ultimately settled with some of them for $1.5 million. *Waste Management*, 144

Ill. 2d at 186. The insureds also retained counsel, defended, and settled the Miller lawsuit. *Waste Management*, 144 Ill. 2d at 186. After doing so, pursuant to their insurance policy, the insureds sought indemnification from their insurers for $2.15 million in settlement costs and $850,000 in defense costs, but the insurers denied coverage. *Waste Management*, 144 Ill. 2d at 186.

¶ 20    Both the insurers and the insureds filed declaratory judgment actions, seeking a determination of their respective rights and liabilities under the insurance policy. *Waste Management*, 144 Ill. 2d at 186. In their complaint, the insurers alleged that one reason for their denial of coverage for the Miller litigation was the insureds' failure to advise them of the Nunn litigation, which the insurers alleged constituted a breach of the cooperation clause and other conditions of the insurance policy. *Waste Management*, 144 Ill. 2d at 187. The parties engaged in discovery and, during discovery, the insurers requested production of defense counsel's files in the underlying Miller and Nunn litigations. *Waste Management*, 144 Ill. 2d at 187. The insureds produced some of the requested documents from the Miller litigation but withheld others on the basis of the attorney-client privilege and work product doctrine; they did not produce any of the files from the Nunn litigation. *Waste Management*, 144 Ill. 2d at 187. The trial court ordered the insureds to produce the files from the Miller litigation but denied the insurers' request for production of the files from the Nunn litigation; the insureds refused to produce any additional documents, and the trial court found them in friendly civil contempt. *Waste Management*, 144 Ill. 2d at 187. The appellate court affirmed in part and reversed in part, and the supreme court granted the insureds' petition for leave to appeal. *Waste Management*, 144 Ill. 2d at 187.

¶ 21    The supreme court found that "the attorney-client privilege has no application in this case." *Waste Management*, 144 Ill. 2d at 191. The court found both of the insurers' arguments to be equally significant and dispositive. *Waste Management*, 144 Ill. 2d at 191. The court first considered the insurers' argument that the cooperation clause of the insurance policy rendered the attorney-client privilege unavailable. The court noted that "[t]he scope of the duties imposed upon an insurer and its insured are defined and controlled by the terms of the insurance contract. Any condition in the policy requiring cooperation on the part of the insured is one of great importance [citation], and its purpose should be observed [citation]." *Waste Management*, 144 Ill. 2d at 191. The court further noted that "[t]he basic purpose of a cooperation clause is to protect the *insurer's interests* and to prevent collusion between the insured and the injured party." (Emphasis in original.) *Waste Management*, 144 Ill. 2d at 191.

¶ 22    The court looked to the cooperation clause contained in the insurance policy at issue, noting that "[t]he cooperation clause in this case imposes upon insureds the duty to assist insurers in the conduct of suits and in enforcing any right to contribution or indemnity against persons potentially liable to insureds. Further, the policy provides that insurers are entitled to conduct any claim, in the name of insureds, for indemnity or damages against persons, and that insureds 'shall give all such information and assistance as the insurers may reasonably require.' " *Waste Management*, 144 Ill. 2d at 192. The court found:

> "Here, the cooperation clause imposes a broad duty of cooperation and is without limitation or qualification. It represents the contractual obligations imposed upon and accepted by insureds at the time they entered into the agreement with insurers. In light of the plain language of the cooperation clause in particular, and language in the policy as a whole, it cannot seriously be contended that insureds would not be

11

required to disclose contents of any communications they had with defense counsel representing them on a claim for which insurers had the ultimate duty to satisfy." *Waste Management*, 144 Ill. 2d at 192.

The court rejected the insureds' argument that their duty to cooperate was rendered moot once the underlying lawsuit was terminated, finding that the "[i]nsureds' duty to cooperate concerning matters covered by the insurance agreement did not end with the termination of the underlying lawsuit, but rather continues for as long as insureds seek to enforce its terms, and certainly to the point when insurers were requested to perform their end of the bargain. The fact that the parties are now adverse concerning the interpretation of such terms does not negate insureds' contractual duty." *Waste Management*, 144 Ill. 2d at 192. The court concluded that "[a] fair reading of the terms of the contract renders any expectation of attorney-client privilege, under these circumstances, unreasonable. We conclude that the element of confidentiality is wanting and, therefore, the attorney-client privilege does not apply to bar discovery of the communications in the underlying lawsuits." *Waste Management*, 144 Ill. 2d at 192-93.

¶ 23    The supreme court found the insurers' second argument, that the attorney-client privilege is unavailable to insureds under the common interest doctrine, to be "equally compelling." *Waste Management*, 144 Ill. 2d at 193. The court noted that "[e]vidence scholars have variously stated that under the common interest doctrine, when an attorney acts for two different parties who each have a common interest, communications by either party to the attorney are not necessarily privileged in a subsequent controversy between the two parties. [Citations.] This is especially so where an insured and his insurer initially have a common interest in defending an action against the former, and there is a possibility that those

communications might play a role in a subsequent action between the insured and his insurer. [Citations.]" *Waste Management*, 144 Ill. 2d at 193-94. The court found that, "[c]learly, here both insurers and insureds had a common interest either in defeating or settling the claim against insureds in the Miller litigation. We believe that the communication by insureds with defense counsel is of a kind reasonably calculated to protect or to further those common interests." *Waste Management*, 144 Ill. 2d at 194.

¶ 24     The court rejected the insureds' argument that the common interest doctrine did not apply because the insurers provided no defense in the underlying suits, finding that "we believe that the doctrine may properly be applied where the attorney, though neither retained by nor in direct communication with the insurer, acts for the mutual benefit of both the insured and the insurer. [Citations.] It is the commonality of interests which creates the exception, not the conduct of the litigation." *Waste Management*, 144 Ill. 2d at 194. The court found:

"On these facts, a less flexible application of the doctrine effectively defeats the purpose and intent of the parties' agreement. Insureds and insurers share a special relationship; they are in privity of contract. In a limited sense, counsel for insureds did represent both insureds and insurers in both of the underlying litigations since insurers were ultimately liable for payment if the plaintiffs in the underlying action received either a favorable verdict or settlement. To deny discovery in this instance would be to disregard considerations of public policy which require encouragement of full disclosure by an insured to his insurer." *Waste Management*, 144 Ill. 2d at 194-95.

The court also found that, despite the fact that the insureds were not seeking attorney fees or settlement costs in the Nunn lawsuit, the insurers were still entitled to the files in that suit

because the insureds' position "overlooks insurers' interest in any potential recovery for contribution from the prior owners of the site. Moreover, insureds' duty to cooperate with insurers is not limited solely to situations where insureds seek recovery of costs. We believe insurers and insureds shared a common interest in the conduct and outcome of the Nunn litigation as well as in the Miller litigation. Thus, insurers are entitled to the Nunn files." *Waste Management*, 144 Ill. 2d at 195.

¶ 25     The supreme court concluded: "In sum, insurers' entitlement to production of the files arises out of the contractual obligations and the common interest doctrine. Their right to complete disclosure is not only necessary to proper resolution of the pending lawsuit, but exists irrespective of the now adversarial nature of the parties' relationship. The attorney-client privilege simply has no application in this case." *Waste Management*, 144 Ill. 2d at 195.

¶ 26                              II. Cooperation Clause

¶ 27     In the case at bar, we agree with plaintiff that *Waste Management* does not encompass the situation present in the instant case, as *Waste Management* involved a factual scenario in which the insurers were seeking documents from the litigation for which the insureds were seeking indemnification. By contrast, in the case at bar, defendants have not sought the files from the litigation in the underlying clean room cases; instead, they are seeking files that were created years prior to any litigation. The difference this distinction makes becomes apparent when examining the cooperation clause of the Zurich policy, which Zurich claims is "virtually identical" to the one at issue in *Waste Management*. The cooperation clause requires plaintiff to "cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or

14

indemnity against any person or organization who may be liable to the insured ***." In *Waste Management*, this clause applied to the files the insurers sought, as they were files that concerned the conduct of the suits and the enforcement of rights of contribution or indemnity. By contrast, nothing in this cooperation clause touches on the disclosure of the contents of plaintiff's CRSP documents, which were created by different attorneys over a decade before any lawsuit was filed. It is thus unclear how the reports created under the CRSP would assist defendants in "making settlements, in the conduct of suits, [or] in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured." At most, such documents would help defeat plaintiff's claims against defendants, which is not a subject included in the cooperation clause. The same is true of the S-1 documents, which are even further removed from the defense of any litigation for which plaintiff seeks coverage, as they are related to securities filings.

¶ 28   The language of the cooperation clause in the instant case further distinguishes the situation here from that present in *Sharp v. Trans Union L.L.C.*, 364 Ill. App. 3d 64 (2006), a case that defendants rely on to expand the holding of *Waste Management* to encompass the present situation. In *Sharp*, after a number of lawsuits were filed against the insured based on allegations that the insured improperly sold consumer information to third parties in violation of the Fair Credit Reporting Act (FCRA) (15 U.S.C. § 1681 *et seq.* (2006)), the insurers filed a complaint for declaratory judgment, seeking a declaration that the lawsuits were not covered under the insurance policy. *Sharp*, 364 Ill. App. 3d at 69. Prior to the inception of the policy, the insured had been the subject of an administrative complaint filed by the Federal Trade Commission (FTC) based on alleged FCRA violations, and had also been the subject of several lawsuits containing similar allegations. *Sharp*, 364 Ill. App. 3d at 66-68. The

15

insurers claimed that the new lawsuits were based on the same acts, errors, violations, and omissions that were known prior to the inception of the policy because they were based on the same allegations as the prepolicy suits. *Sharp*, 364 Ill. App. 3d at 69. During discovery, the insurers sought "pre-policy documents that reflect, potentially reflect, or pertain to [the insured's] and/or its general counsel's knowledge and/or analysis of the FCRA, the FTC litigation, and private litigation arising from the same allegations as the FTC litigation." *Sharp*, 364 Ill. App. 3d at 70. The trial court found that the policy's cooperation clause required the insured to produce the documents, and the appellate court affirmed.

¶ 29    The appellate court looked to *Waste Management* and noted that, while *Sharp* involved documents that were created prior to the inception of the policy, it nevertheless found the *Waste Management* court's analysis "instructive" (*Sharp*, 364 Ill. App. 3d at 72) because "[t]he broad policies articulated by the supreme court in *Waste Management* are equally applicable to our interpretation of the insurance contract at issue here" (*Sharp*, 364 Ill. App. 3d at 72). The court found that "[o]ur application of principles of contract interpretation and the policies articulated in *Waste Management* reveals that the parties' manuscripted insurance policy was negotiated and written to require the disclosure of [the insured's] general counsel's knowledge, work product, and communications regarding the pre-policy litigation." *Sharp*, 364 Ill. App. 3d at 72.

¶ 30    The court pointed to exclusion (g) of the policy, which excluded " 'any Claim arising out of acts, errors, violations or omissions that took place prior to the effective date of this Insurance, if the [general counsel[4]] of the Named Assured on the effective date knew that such acts, errors, violations or omissions might be expected to be the basis of a Claim.' "

---

[4]The policy originally stated "Chief Financial Officer," but the policy was amended to change the term to "General Counsel." *Sharp*, 364 Ill. App. 3d at 68.

*Sharp*, 364 Ill. App. 3d at 68. The court found that the policy protected the insurers from insuring a known loss and "effectively defines known losses in terms of the general counsel's knowledge by excluding errors and omissions that [the insured's] general counsel knew might be the basis of a future claim. The only way to determine whether [the insured's] general counsel knew that a particular act might be the basis of a claim would be to look at the general counsel's legal reasoning and analysis of that act." *Sharp*, 364 Ill. App. 3d at 73. The court further pointed to the policy's cooperation clause, which provided that " '[t]he Assured shall co-operate with the [insurers] in all investigations, including investigations regarding the application and coverage under this Policy.' " *Sharp*, 364 Ill. App. 3d at 68. The court found that reading the specific language of the cooperation clause together with exclusion (g), the insured "agreed to share the legal reasoning and analysis of its general counsel regarding whether there might be future claims based on its sale of target marketing information." *Sharp*, 364 Ill. App. 3d at 73. The court noted that, "[a]lthough such information may be privileged because it is legal advice given by the general counsel to the corporation about whether its actions could result in liability [citation], [the insured], in agreeing to a policy with such particular language, has agreed to share this information with [the insurers] under these circumstances." *Sharp*, 364 Ill. App. 3d at 73.

¶ 31      The court further found that its reading of the insurance contact was supported by Illinois public policy, which, as the *Waste Management* court had found, "encourag[ed] disclosure between insurer and insured, 'with an eye toward ascertaining that truth which is essential to the proper disposition of a lawsuit.' " *Sharp*, 364 Ill. App. 3d at 73-74 (quoting *Waste Management*, 144 Ill. 2d at 190). Additionally, "[t]he supreme court has also emphasized that the purpose of an insurance contract is to protect the insured against loss, damage, or liability

17

arising from an *unknown or contingent event* and is applicable only to *some contingency or act to occur in [the] future*." (Emphases in original and internal quotation marks omitted.) *Sharp*, 364 Ill. App. 3d at 74 (quoting *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 103 (1992)). "If the insured knows that a loss will occur, it is not a contingency and would not be covered under an insurance contract absent an express agreement to do so. [Citation.] Thus, public policy would favor requiring an insured to share information with its insurer that would reveal whether a risk was known. The provisions of the insurance contract between [the insurers] and [the insured] promote these policies by requiring [the insured] to share information regarding whether its general counsel knew of particular losses. Accordingly, public policy supports enforcing the policy as written." *Sharp*, 364 Ill. App. 3d at 74.

¶ 32    In the case at bar, as noted, the insurance policy at issue is significantly different than that present in *Sharp*. The policy itself does not define a "known loss" in terms of plaintiff's general counsel's knowledge, nor does the cooperation clause expressly require plaintiff's cooperation in investigations of coverage questions. Defendants do not even acknowledge the extremely different language of the policies in the two cases, despite the fact that the *Sharp* court expressly relied on the policy's language in finding that disclosure was required. Furthermore, as plaintiff notes, the coverage issue in *Sharp* was the "known loss" exclusion, while the issue in the instant case was whether there was a timely notice of occurrence. Accordingly, we find *Sharp* of limited usefulness to the instant case.

¶ 33    As noted, in the case at bar, the factual situation is quite different from that present in *Waste Management* because, here, defendants are not seeking the files of the attorneys engaged in litigation of the underlying cases, as was the case in *Waste Management*. Instead,

18

defendants are seeking documents created well before any litigation had commenced. While "[a]ny condition in the policy requiring cooperation on the part of the insured is one of great importance [citation], and its purpose should be observed [citation]" (*Waste Management*, 144 Ill. 2d at 191), this duty is not boundless. It must remain tied to the language of the cooperation clause itself. Here, the cooperation clause requires plaintiff to "cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured." Defendants have not explained how either the CRSP documents or the S-1 documents would "assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured." Instead, defendants are seeking the documents to determine whether they can defeat plaintiff's request for coverage as a result of a late notice. Consequently, we cannot find that *Waste Management* encompasses the situation in the case at bar with respect to the cooperation clause contained in the insurance policy.

¶ 34                                         III. Common Interest Doctrine

¶ 35       We also find that the *Waste Management* court's discussion of the common interest doctrine is inapplicable to the instant case. In *Waste Management*, as noted, the supreme court found that "[c]learly, here both insurers and insureds had a common interest either in defeating or settling the claim against insureds in the Miller litigation. We believe that the communication by insureds with defense counsel is of a kind reasonably calculated to protect or to further those common interests." *Waste Management*, 144 Ill. 2d at 194. The court further found that "[i]nsureds and insurers share a special relationship; they are in privity of

contract. In a limited sense, counsel for insureds did represent both insureds and insurers in both of the underlying litigations since insurers were ultimately liable for payment if the plaintiffs in the underlying action received either a favorable verdict or settlement. To deny discovery in this instance would be to disregard considerations of public policy which require encouragement of full disclosure by an insured to his insurer." *Waste Management*, 144 Ill. 2d at 194-95.

¶ 36    In the case at bar, however, as noted, there was no "underlying litigation" from which defendants are seeking disclosure. Instead, they are seeking documents prepared years before the first lawsuit was filed. While an insurer would certainly have an interest in communications concerning ongoing litigation against its insured, it would be straining the *Waste Management* court's reasoning to stretch that commonality of interest to the situation that presents itself in the instant case. Consequently, we agree with plaintiff that *Waste Management* is inapplicable to the instant case.

¶ 37    We note that our decision does not necessarily mean that all of the documents withheld by plaintiff are properly shielded by the attorney-client privilege. "[I]t is the privilege, not the duty to disclose, that is the exception. [Citation.] Therefore, the privilege ought to be strictly confined within its narrowest possible limits." *Waste Management*, 144 Ill. 2d at 190. Any documents withheld by plaintiff will need to be evaluated to determine whether they are privileged, as would ordinarily be done. In other words, our decision only means that the attorney-client privilege *may* apply, not that it *does* apply to each document withheld by plaintiff. That is a question more properly considered by the trial court in the first instance, as the trial court should conduct an *in camera* examination of the documents.

¶ 38                                    IV. *Peppers* Doctrine

¶ 39        Plaintiff also argues that the trial court's order requiring it to produce the documents is especially inappropriate because defendants are attempting to litigate facts that overlap with the facts at issue in the underlying litigation in contravention of the "*Peppers* doctrine," which was set forth by our supreme court in *Maryland Casualty Co. v. Peppers*, 64 Ill. 2d 187 (1976). Even though we have determined that the attorney-client privilege remains available to shield these documents, a discussion of plaintiff's *Peppers* argument is nevertheless useful.

¶ 40        "Under the *Peppers* doctrine, 'it is generally inappropriate for a court considering a declaratory judgment action to decide issues of ultimate fact that could bind the parties to the underlying litigation.' " *Landmark American Insurance Co. v. NIP Group, Inc.*, 2011 IL App (1st) 101155, ¶ 59 (quoting *Allstate Insurance Co. v. Kovar*, 363 Ill. App. 3d 493, 501 (2006)). "This proscription specifically precludes determination of any ultimate facts upon which liability or recovery might be predicated in the underlying case." *NIP Group, Inc.*, 2011 IL App (1st) 101155, ¶ 59. Thus, it is an abuse of discretion for a trial court in a declaratory judgment action to make such a determination. *Peppers*, 64 Ill. 2d at 196; *Empire Fire & Marine Insurance Co. v. Clarendon Insurance Co.*, 267 Ill. App. 3d 1022, 1027 (1994).

¶ 41        In the case at bar, we agree with defendants that the *Peppers* doctrine is inapplicable to the instant situation. The trial court is not being asked to " 'decide issues of ultimate fact that could bind the parties to the underlying litigation.' " *NIP Group, Inc.*, 2011 IL App (1st) 101155, ¶ 59 (quoting *Kovar*, 363 Ill. App. 3d at 501). Instead, the question before the trial court is simply whether defendants are permitted to view certain documents that plaintiff

claims are privileged in order to oppose plaintiff's motion for summary judgment. As defendants note, " '[t]he purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). Thus, in deciding plaintiff's motion for summary judgment, the trial court is asked only to determine whether there is a question of fact as to the issue of notice and is not asked to determine the issue of notice as a matter of law. We acknowledge that, in the future, the trial court may be asked to decide whether plaintiff provided a timely notice of occurrence. However, that is not the issue before this court today and, despite plaintiff's urging to the contrary, we will not speculate as to whether the future issues that the trial court will be asked to determine violate the *Peppers* doctrine.

¶ 42    We also note that, in situations where the *Peppers* doctrine is at issue, a court will often order a stay of the coverage litigation pending the resolution of the underlying litigation. See, *e.g.*, *Sentry Insurance v. Continental Casualty Co.*, 2017 IL App (1st) 161785 (appeal of a trial court's stay of insurance coverage litigation due to *Peppers* concerns). In the case at bar, however, neither party at oral argument indicated that it desired a stay. Furthermore, a stay would not seem to be in the parties' best interest, as the resolution of the underlying litigation would have no effect on the late notice defense asserted by defendants, which concerns whether plaintiff timely provided notice of occurrence.

¶ 43                                    CONCLUSION

¶ 44        For the reasons set forth above, we find that the situation present in the case at bar is not

encompassed by our supreme court's holding in *Waste Management*. Accordingly, the

attorney-client privilege is available to shield any appropriate documents from discovery.

¶ 45        Reversed; contempt finding vacated.