2017 IL App (1st) 161465

Fifth Division
Modified opinion filed August 4, 2017

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

|  |  |  |
|---|---|---|
| MOTOROLA SOLUTIONS, INC., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ZURICH INSURANCE COMPANY; ASSOCIATED | ) | Appeal from the Circuit Court |
| INDEMNITY CORPORATION; CONTINENTAL | ) | of Cook County. |
| CASUALTY COMPANY; NATIONAL FIRE | ) | |
| INSURANCE COMPANY OF HARTFORD; | ) | No. 11 L 001902 |
| TRANSPORTATION INSURANCE COMPANY; | ) | |
| AMERICAN CASUALTY INSURANCE COMPANY | ) | The Honorable |
| OF READING, PENNSYLVANIA; LIBERTY | ) | Margaret A. Brennan, |
| MUTUAL FIRE INSURANCE COMPANY; and | ) | Judge Presiding. |
| LIBERTY INSURANCE COMPANY, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| (Zurich Insurance Company and Associated Indemnity | ) | |
| Corporation, | ) | |
| Defendants-Appellees). | ) | |
| | ) | |

_____

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justice Hall concurred in the judgment and opinion.
Justice Lampkin dissented, with opinion.

**OPINION**

¶ 1        The instant appeal arises from a discovery dispute between plaintiff Motorola Solutions,

Inc., and defendants Zurich Insurance Company (Zurich) and Associated Indemnity

Corporation (Associated) concerning the production of documents that plaintiff claims are privileged. The parties are engaged in insurance coverage litigation, stemming from several underlying personal injury actions in which claims were asserted against plaintiff. Plaintiff filed a motion for summary judgment with respect to Zurich's duty to defend one of the actions and the trial court stayed briefing on the motion to permit limited discovery concerning a late notice defense asserted by defendants. As part of discovery, defendants sought the production of several documents that plaintiff claimed were privileged. The trial court ordered plaintiff to turn over the documents, and plaintiff refused. The trial court then held plaintiff in friendly civil contempt to permit plaintiff to appeal. For the reasons that follow, we reverse the trial court's order requiring production of the documents and vacate the friendly contempt order.

¶ 2                                          BACKGROUND

¶ 3        We note that the parties' briefs and portions of the record on appeal were permitted to be filed under seal. While we respect the parties' wishes to keep confidential material private, our consideration of the issues on appeal necessarily requires us to discuss details of some of these documents. However, we include only those details necessary to our resolution of the issues on appeal.

¶ 4        The instant appeal is the third time the parties have been before this court with respect to the insurance coverage litigation: we considered the scope of releases executed by the parties in *Motorola Solutions, Inc. v. Zurich Insurance Co.*, 2015 IL App (1st) 131529, and considered underlying plaintiffs' requests to intervene in *Motorola Solutions, Inc. v. Continental Casualty Co.*, 2015 IL App (1st) 131724-U. To the extent that these earlier

decisions discuss facts that are helpful to our understanding of the issues in the instant appeal, we repeat them here.

¶ 5    On February 18, 2011, plaintiff filed a complaint for declaratory judgment and breach of contract against a number of insurance companies, including Zurich and Associated; the complaint was amended on July 1, 2011, and again on February 22, 2013. Plaintiff sought for the insurers to provide it legal representation to defend plaintiff and/or coverage for defense costs under insurance policies issued by each of the insurers for four underlying personal injury actions in which claims were asserted against plaintiff.

¶ 6    The four underlying actions (the clean room cases) alleged that plaintiff was liable for injuries that children of plaintiff's former employees and contractors allegedly sustained as a result of exposure to various chemicals in "clean rooms" in plaintiff's manufacturing facilities. According to plaintiff's complaint, from the 1960s through 2003, plaintiff operated facilities that manufactured, among other things, semiconductor products. These facilities included certain rooms that were designated as "clean rooms" in which the semiconductor products were manufactured, which "were designed to prevent dust and other similar materials from contacting semiconductor components during the manufacturing process." The clean room cases all involved substantially similar allegations, in general alleging that hazardous or toxic materials were present in the "clean rooms" and that "either the father, the mother, or both worked in [plaintiff's] clean room facility for some period of time before, and in a number of cases after, the [underlying] plaintiff child was born; often the period of employment [was] alleged to have continued through the *in utero* period. The [underlying] plaintiffs generally claim[ed] that the children were injured as a result of parents working in clean rooms" as a result of toxic exposure.

¶ 7          Plaintiff's complaint alleges that one or more of the insurer defendants had a duty to defend and/or pay defense costs in the clean room cases and that, by failing to do so, the insurers had breached their obligations to plaintiff under the insurance policies.

¶ 8          Both of the defendants in the instant appeal filed answers and affirmative defenses and included counterclaims in which they alleged that plaintiff had released all of its claims for coverage for the clean room cases in settlement agreements and releases that the parties had executed in 2003. The parties then engaged in litigation concerning the scope of the releases, which culminated in a bench trial on the issue in December 2012 and defendants' first appeal before this court in 2015, in which we affirmed the trial court's finding that the releases did not encompass the claims in the clean room cases. See *Motorola Solutions, Inc. v. Zurich Insurance Co.*, 2015 IL App (1st) 131529. During the pendency of the appeal, the trial court stayed all action in the coverage litigation. However, the underlying plaintiffs in one of the clean room cases sought to intervene in the coverage litigation in order to seek a modification of a protective order covering discovery that had been conducted concerning the scope of the releases. The trial court declined to assert jurisdiction on the motion to intervene in light of the order staying the proceedings, and the appeal of that order was the basis for our second decision in this matter. See *Motorola Solutions, Inc. v. Continental Casualty Co.*, 2015 IL App (1st) 131724-U.

¶ 9          According to plaintiff's brief, while the issue concerning the scope of the releases was being litigated, plaintiff was "effectively denied a defense" of the clean room cases "for several years." During that time, the underlying clean room cases were proceeding, and on September 3, 2015, plaintiff filed a motion for summary judgment against Zurich, seeking a

declaratory judgment regarding Zurich's duty to defend one of those underlying claims.[1] In response, Zurich filed a motion pursuant to Illinois Supreme Court Rule 191(b) (eff. Jan. 4, 2013), seeking leave to take discovery concerning the timeliness of plaintiff's notice to Zurich prior to responding to plaintiff's summary judgment motion. The trial court granted Zurich's motion on November 12, 2015, but ordered the parties to meet and confer about the scope of discovery and the entry of a protective order. The parties negotiated an agreed protective order, which the trial court entered on January 12, 2016.

¶ 10    The discovery sought by Zurich, later joined by Associated, included two categories of documents at issue on appeal. One consisted of documents pertaining to plaintiff's clean room safety program (CRSP documents). In the 1990s, a number of lawsuits had been filed against IBM, a competitor of plaintiff's, concerning alleged birth defects found in children whose parents worked in the manufacturing process in creating semiconductors in IBM's clean room facilities. According to plaintiff, "[plaintiff], as a prudent company also operating in that manufacturing sector, engaged counsel and formed a working group to conduct an analysis of [plaintiff's] practices in and risks arising from its clean rooms." This was known as plaintiff's "Clean Room Safety Program." The efforts of the program resulted in the creation of the CRSP documents in 1996, reports prepared by, or at the direction of, plaintiff's outside counsel. These CRSP documents had been sought by defendants since discovery began in the coverage litigation, with plaintiff withholding the documents on the basis of both the attorney-client privilege and the work product doctrine. Production of these documents has also previously been considered by this court on appeal, where we affirmed the trial court's finding that the CRSP documents were not relevant to the issue of

---

[1]According to the parties, the underlying claim has since been settled.

determining the scope of the releases in the first appeal. See *Motorola Solutions*, 2015 IL App (1st) 131529, ¶¶ 135-42. Documents concerning plaintiff's knowledge of the clean room risks are also of great interest to the underlying clean room plaintiffs, who sought to intervene during the pendency of the first appeal in order to obtain access to documents covered by a protective order.[2] See *Motorola Solutions*, 2015 IL App (1st) 131724-U, ¶ 3.

¶ 11    The second category of documents sought by defendants concerned plaintiff's 2003 sale of its semiconductor manufacturing business to a new entity, Freescale Semiconductor, Inc. In the course of that sale, plaintiff was required to file a United States Securities and Exchange Commission Form S-1 Registration Statement (S-1 documents). The form contains a section entitled "Risk Factors," which informs potential investors about "significant risk factors currently known and unique to" the seller of the securities. In this disclosure, plaintiff stated:

> "In the last few years, there has been increased media scrutiny and associated reports focusing on a potential link between working in semiconductor manufacturing clean room environments and certain illnesses, primarily different types of cancers *** Because we utilize these clean rooms, we may become subject to liability claims."

Defendants sought access to the documents related to the S-1 securities filing.

¶ 12    In response to defendants' discovery requests, plaintiff declined to produce the CRSP documents or the S-1 documents and, on January 20, 2016, defendants filed a motion to compel production of the documents. In the motion, defendants claimed that these documents were material evidence showing that plaintiff had been aware of the facts underlying the clean room actions since at least 1996 and that defendants intended to rely on this evidence to

---

[2]According to plaintiff, the underlying clean room plaintiffs again sought to intervene shortly after the trial court granted the Rule 191(b) motion for discovery but were again unsuccessful.

support their late notice defense. Defendants argued that under the Illinois Supreme Court case of *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178 (1991), the attorney-client privilege and work product doctrines did not apply to shield production of such documents from plaintiff's insurers. In its response, plaintiff contended that the CRSP documents were not prepared in connection with the defense of the clean room actions and that plaintiff did not learn until December 2007 that any individuals were considering pursuing any action against plaintiff, information which plaintiff promptly forwarded to its insurers.

¶ 13   On March 8, 2016, the trial court granted defendants' motion to compel, ordering plaintiff to produce:

"All documents comprising the CRSP Notebook, as identified on the privilege logs attached as Exhibits 2 and 17 to the Affidavit of Karen M. Dixon.

All communications to or from [plaintiff's] legal and/or risk management departments concerning the Clean Room Safety Program or any other assessments of [plaintiff's] potential liability for bodily injury claims arising out of the Clean Rooms and/or the Clean Room Chemicals, Substances and Radiation.

All documents in the possession of [plaintiff's] Corporate Insurance Department (a/k/a risk management) that refer in any way to the Clean Rooms.

All documents, including all communications with [plaintiff's] risk management or legal department, concerning the disclosure of potential clean room related liabilities to investors in *** December 2003 (the SEC S-1 Filing).

All documents/communications that refer in any way to potential clean room related claims and/or liabilities that were received, sent, or created by [plaintiff's]

7

legal and/or risk management departments prior to [plaintiff's] first notice to Associated/Zurich."

¶ 14    On March 29, 2016, plaintiff filed a motion for reconsideration or, in the alternative, for a finding of friendly contempt in order for plaintiff to appeal. On May 4, 2016, the trial court denied plaintiff's motion for reconsideration and found plaintiff in friendly contempt for refusing to comply with its discovery order, imposing a $100 penalty. This appeal follows.[3]

¶ 15                                        ANALYSIS

¶ 16    The instant appeal was filed pursuant to Illinois Supreme Court Rule 304(b)(5) (eff. Mar. 8, 2016), which permits an interlocutory appeal of "[a]n order finding a person or entity in contempt of court which imposes a monetary or other penalty." Here, the trial court found plaintiff in contempt of court and imposed a monetary penalty. Accordingly, we have jurisdiction to consider plaintiff's appeal. "Because discovery orders are not final orders, they are not ordinarily appealable." *Norskog v. Pfiel*, 197 Ill. 2d 60, 69 (2001). "However, it is well settled that the correctness of a discovery order may be tested through contempt proceedings." *Norskog*, 197 Ill. 2d at 69. "When [a party] appeals contempt sanctions imposed for violating, or threatening to violate, a pretrial discovery order, the discovery order is subject to review. [Citation.] Review of the contempt finding necessarily requires review of the order upon which it is based. [Citation.]" *Norskog*, 197 Ill. 2d at 69.

¶ 17    On appeal, plaintiff argues that the trial court erred in ordering it to produce the CRSP documents and the S-1 documents. We note that before the trial court, plaintiff argued that the documents were shielded by both the attorney-client privilege and the work product doctrine; however, on appeal, plaintiff focuses only on the attorney-client privilege, and

---

[3]We note that Associated did not file a separate brief on appeal but joined in and adopted Zurich's brief.

accordingly, we will do the same. "Although a trial court's discovery order is ordinarily reviewed for a manifest abuse of discretion [citation], the proper standard of review depends on the question that was answered in the trial court [citation]." *Norskog*, 197 Ill. 2d at 70. "If the facts are uncontroverted and the issue is the trial court's application of the law to the facts, a court of review may determine the correctness of the ruling independently of the trial court's judgment." *Norskog*, 197 Ill. 2d at 70-71. In the case at bar, the facts are uncontroverted and we are considering whether the trial court properly applied the law concerning privilege between an insured and its insurer to the uncontroverted facts. Accordingly, this is an issue of law that we review *de novo*. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 18                              I. *Waste Management*

¶ 19        As the parties recognize, the primary case concerning this issue is our supreme court's decision in *Waste Management*. Accordingly, we must consider the case, and its holding, in considerable detail. In *Waste Management*, the insureds owned and operated a hazardous waste disposal site that was the subject of a lawsuit alleging that the insured was responsible for personal injury and property damage arising from the migration of toxic waste (the Miller litigation). *Waste Management*, 144 Ill. 2d at 186. During the pendency of the Miller litigation, the prior owners of the hazardous waste disposal site filed suit against the insureds and the insureds filed a counterclaim, alleging negligent design, construction, and operation of the site (the Nunn litigation). *Waste Management*, 144 Ill. 2d at 186. The insureds obtained a $10.675 million judgment in their favor against the prior owners in the Nunn litigation and ultimately settled with some of them for $1.5 million. *Waste Management*, 144

Ill. 2d at 186. The insureds also retained counsel, defended, and settled the Miller lawsuit. *Waste Management*, 144 Ill. 2d at 186. After doing so, pursuant to their insurance policy, the insureds sought indemnification from their insurers for $2.15 million in settlement costs and $850,000 in defense costs, but the insurers denied coverage. *Waste Management*, 144 Ill. 2d at 186.

¶ 20    Both the insurers and the insureds filed declaratory judgment actions, seeking a determination of their respective rights and liabilities under the insurance policy. *Waste Management*, 144 Ill. 2d at 186. In their complaint, the insurers alleged that one reason for their denial of coverage for the Miller litigation was the insureds' failure to advise them of the Nunn litigation, which the insurers alleged constituted a breach of the cooperation clause and other conditions of the insurance policy. *Waste Management*, 144 Ill. 2d at 187. The parties engaged in discovery and, during discovery, the insurers requested production of defense counsel's files in the underlying Miller and Nunn litigations. *Waste Management*, 144 Ill. 2d at 187. The insureds produced some of the requested documents from the Miller litigation but withheld others on the basis of the attorney-client privilege and work product doctrine; they did not produce any of the files from the Nunn litigation. *Waste Management*, 144 Ill. 2d at 187. The trial court ordered the insureds to produce the files from the Miller litigation but denied the insurers' request for production of the files from the Nunn litigation; the insureds refused to produce any additional documents, and the trial court found them in friendly civil contempt. *Waste Management*, 144 Ill. 2d at 187. The appellate court affirmed in part and reversed in part, and the supreme court granted the insureds' petition for leave to appeal. *Waste Management*, 144 Ill. 2d at 187.

¶ 21    The supreme court found that "the attorney-client privilege has no application in this case." *Waste Management*, 144 Ill. 2d at 191. The court found both of the insurers' arguments to be equally significant and dispositive. *Waste Management*, 144 Ill. 2d at 191. The court first considered the insurers' argument that the cooperation clause of the insurance policy rendered the attorney-client privilege unavailable. The court noted that "[t]he scope of the duties imposed upon an insurer and its insured are defined and controlled by the terms of the insurance contract. Any condition in the policy requiring cooperation on the part of the insured is one of great importance [citation], and its purpose should be observed [citation]." *Waste Management*, 144 Ill. 2d at 191. The court further noted that "[t]he basic purpose of a cooperation clause is to protect the *insurer's interests* and to prevent collusion between the insured and the injured party." (Emphasis in original.) *Waste Management*, 144 Ill. 2d at 191.

¶ 22    The court looked to the cooperation clause contained in the insurance policy at issue, noting that "[t]he cooperation clause in this case imposes upon insureds the duty to assist insurers in the conduct of suits and in enforcing any right to contribution or indemnity against persons potentially liable to insureds. Further, the policy provides that insurers are entitled to conduct any claim, in the name of insureds, for indemnity or damages against persons, and that insureds 'shall give all such information and assistance as the insurers may reasonably require.' " [4] *Waste Management*, 144 Ill. 2d at 192. The court found:

---

[4] We note that the dissent appears to take issue with our reliance on this aspect of the *Waste Management* analysis, given that the *Waste Management* insureds in their petition for rehearing claimed that the language of the policy at issue did not actually contain this language. See *Waste Management*, 144 Ill. 2d at 201-02. However, the insureds' later arguments have no bearing on this portion of the court's discussion, which remains good law. In its supplemental opinion, the court expressly makes no finding as to the merits of the insureds' claims concerning the contractual language but finds that, assuming *arguendo* the insureds were correct, a duty to cooperate nevertheless "could reasonably be inferred based merely on principles of fairness and good faith." *Waste Management*, 144 Ill. 2d at 202. Thus, the *Waste Management* court merely finds an additional basis for its holding and does not in any way invalidate its earlier discussion concerning the language of the policy.

"Here, the cooperation clause imposes a broad duty of cooperation and is without limitation or qualification. It represents the contractual obligations imposed upon and accepted by insureds at the time they entered into the agreement with insurers. In light of the plain language of the cooperation clause in particular, and language in the policy as a whole, it cannot seriously be contended that insureds would not be required to disclose contents of any communications they had with defense counsel representing them on a claim for which insurers had the ultimate duty to satisfy." *Waste Management*, 144 Ill. 2d at 192.

The court rejected the insureds' argument that their duty to cooperate was rendered moot once the underlying lawsuit was terminated, finding that the "[i]nsureds' duty to cooperate concerning matters covered by the insurance agreement did not end with the termination of the underlying lawsuit, but rather continues for as long as insureds seek to enforce its terms, and certainly to the point when insurers were requested to perform their end of the bargain. The fact that the parties are now adverse concerning the interpretation of such terms does not negate insureds' contractual duty." *Waste Management*, 144 Ill. 2d at 192. The court concluded that "[a] fair reading of the terms of the contract renders any expectation of attorney-client privilege, under these circumstances, unreasonable. We conclude that the element of confidentiality is wanting and, therefore, the attorney-client privilege does not apply to bar discovery of the communications in the underlying lawsuits." *Waste Management*, 144 Ill. 2d at 192-93.

¶ 23        The supreme court found the insurers' second argument, that the attorney-client privilege is unavailable to insureds under the common interest doctrine, to be "equally compelling." *Waste Management*, 144 Ill. 2d at 193. The court noted that "[e]vidence scholars have

variously stated that under the common interest doctrine, when an attorney acts for two different parties who each have a common interest, communications by either party to the attorney are not necessarily privileged in a subsequent controversy between the two parties. [Citations.] This is especially so where an insured and his insurer initially have a common interest in defending an action against the former, and there is a possibility that those communications might play a role in a subsequent action between the insured and his insurer. [Citations.]" *Waste Management*, 144 Ill. 2d at 193-94. The court found that, "[c]learly, here both insurers and insureds had a common interest either in defeating or settling the claim against insureds in the Miller litigation. We believe that the communication by insureds with defense counsel is of a kind reasonably calculated to protect or to further those common interests." *Waste Management*, 144 Ill. 2d at 194.

¶ 24     The court rejected the insureds' argument that the common interest doctrine did not apply because the insurers provided no defense in the underlying suits, finding that "we believe that the doctrine may properly be applied where the attorney, though neither retained by nor in direct communication with the insurer, acts for the mutual benefit of both the insured and the insurer. [Citations.] It is the commonality of interests which creates the exception, not the conduct of the litigation." *Waste Management*, 144 Ill. 2d at 194. The court found:

    "On these facts, a less flexible application of the doctrine effectively defeats the purpose and intent of the parties' agreement. Insureds and insurers share a special relationship; they are in privity of contract. In a limited sense, counsel for insureds did represent both insureds and insurers in both of the underlying litigations since insurers were ultimately liable for payment if the plaintiffs in the underlying action received either a favorable verdict or settlement. To deny discovery in this instance

13

would be to disregard considerations of public policy which require encouragement of full disclosure by an insured to his insurer." *Waste Management*, 144 Ill. 2d at 194-95.

The court also found that, despite the fact that the insureds were not seeking attorney fees or settlement costs in the Nunn lawsuit, the insurers were still entitled to the files in that suit because the insureds' position "overlooks insurers' interest in any potential recovery for contribution from the prior owners of the site. Moreover, insureds' duty to cooperate with insurers is not limited solely to situations where insureds seek recovery of costs. We believe insurers and insureds shared a common interest in the conduct and outcome of the Nunn litigation as well as in the Miller litigation. Thus, insurers are entitled to the Nunn files." *Waste Management*, 144 Ill. 2d at 195.

¶ 25    The supreme court concluded: "In sum, insurers' entitlement to production of the files arises out of the contractual obligations and the common interest doctrine. Their right to complete disclosure is not only necessary to proper resolution of the pending lawsuit, but exists irrespective of the now adversarial nature of the parties' relationship. The attorney-client privilege simply has no application in this case." *Waste Management*, 144 Ill. 2d at 195.

¶ 26                                  II. Cooperation Clause

¶ 27    In the case at bar, we agree with plaintiff that *Waste Management* does not encompass the situation present in the instant case, as *Waste Management* involved a factual scenario in which the insurers were seeking documents from the litigation for which the insureds were seeking indemnification. By contrast, in the case at bar, defendants have not sought the files from the litigation in the underlying clean room cases; instead, they are seeking files that

were created years prior to any litigation. The difference this distinction makes becomes apparent when examining the cooperation clause of the Zurich policy, which Zurich claims is "virtually identical" to the one at issue in *Waste Management*. The cooperation clause requires plaintiff to "cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured ***." In *Waste Management*, this clause applied to the files the insurers sought, as they were files that concerned the conduct of the suits and the enforcement of rights of contribution or indemnity. By contrast, nothing in this cooperation clause touches on the disclosure of the contents of plaintiff's CRSP documents, which were created by different attorneys over a decade before any lawsuit was filed. It is thus unclear how the reports created under the CRSP would assist defendants in "making settlements, in the conduct of suits, [or] in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured." At most, such documents would help defeat plaintiff's claims against defendants, which is not a subject included in the cooperation clause. The same is true of the S-1 documents, which are even further removed from the defense of any litigation for which plaintiff seeks coverage, as they are related to securities filings.[5]

¶ 28    The language of the cooperation clause in the instant case further distinguishes the situation here from that present in *Sharp v. Trans Union L.L.C.*, 364 Ill. App. 3d 64 (2006), a case that defendants rely on to expand the holding of *Waste Management* to encompass the present situation. In *Sharp*, after a number of lawsuits were filed against the insured based on

---

[5] In their petition for rehearing, defendants point to additional language in the cooperation clause which requires plaintiff to "assist in effecting settlements, *securing and giving evidence*, obtaining the attendance of witnesses and in the conduct of suits." (Emphasis added.) However, we do not find that this language changes any of our analysis.

allegations that the insured improperly sold consumer information to third parties in violation of the Fair Credit Reporting Act (FCRA) (15 U.S.C. § 1681 *et seq.* (2006)), the insurers filed a complaint for declaratory judgment, seeking a declaration that the lawsuits were not covered under the insurance policy. *Sharp*, 364 Ill. App. 3d at 69. Prior to the inception of the policy, the insured had been the subject of an administrative complaint filed by the Federal Trade Commission (FTC) based on alleged FCRA violations, and had also been the subject of several lawsuits containing similar allegations. *Sharp*, 364 Ill. App. 3d at 66-68. The insurers claimed that the new lawsuits were based on the same acts, errors, violations, and omissions that were known prior to the inception of the policy because they were based on the same allegations as the prepolicy suits. *Sharp*, 364 Ill. App. 3d at 69. During discovery, the insurers sought "pre-policy documents that reflect, potentially reflect, or pertain to [the insured's] and/or its general counsel's knowledge and/or analysis of the FCRA, the FTC litigation, and private litigation arising from the same allegations as the FTC litigation." *Sharp*, 364 Ill. App. 3d at 70. The trial court found that the policy's cooperation clause required the insured to produce the documents, and the appellate court affirmed.

¶ 29    The appellate court looked to *Waste Management* and noted that, while *Sharp* involved documents that were created prior to the inception of the policy, it nevertheless found the *Waste Management* court's analysis "instructive" (*Sharp*, 364 Ill. App. 3d at 72) because "[t]he broad policies articulated by the supreme court in *Waste Management* are equally applicable to our interpretation of the insurance contract at issue here" (*Sharp*, 364 Ill. App. 3d at 72). The court found that "[o]ur application of principles of contract interpretation and the policies articulated in *Waste Management* reveals that the parties' manuscripted insurance policy was negotiated and written to require the disclosure of [the insured's]

general counsel's knowledge, work product, and communications regarding the pre-policy litigation." *Sharp*, 364 Ill. App. 3d at 72.

¶ 30    The court pointed to exclusion (g) of the policy, which excluded " 'any Claim arising out of acts, errors, violations or omissions that took place prior to the effective date of this Insurance, if the [general counsel[6]] of the Named Assured on the effective date knew that such acts, errors, violations or omissions might be expected to be the basis of a Claim.' " *Sharp*, 364 Ill. App. 3d at 68. The court found that the policy protected the insurers from insuring a known loss and "effectively defines known losses in terms of the general counsel's knowledge by excluding errors and omissions that [the insured's] general counsel knew might be the basis of a future claim. The only way to determine whether [the insured's] general counsel knew that a particular act might be the basis of a claim would be to look at the general counsel's legal reasoning and analysis of that act." *Sharp*, 364 Ill. App. 3d at 73. The court further pointed to the policy's cooperation clause, which provided that " '[t]he Assured shall co-operate with the [insurers] in all investigations, including investigations regarding the application and coverage under this Policy.' " *Sharp*, 364 Ill. App. 3d at 68. The court found that reading the specific language of the cooperation clause together with exclusion (g), the insured "agreed to share the legal reasoning and analysis of its general counsel regarding whether there might be future claims based on its sale of target marketing information." *Sharp*, 364 Ill. App. 3d at 73. The court noted that, "[a]lthough such information may be privileged because it is legal advice given by the general counsel to the corporation about whether its actions could result in liability [citation], [the insured], in

_____

[6]The policy originally stated "Chief Financial Officer," but the policy was amended to change the term to "General Counsel." *Sharp*, 364 Ill. App. 3d at 68.

agreeing to a policy with such particular language, has agreed to share this information with [the insurers] under these circumstances." *Sharp*, 364 Ill. App. 3d at 73.

¶ 31    The court further found that its reading of the insurance contact was supported by Illinois public policy, which, as the *Waste Management* court had found, "encourag[ed] disclosure between insurer and insured, 'with an eye toward ascertaining that truth which is essential to the proper disposition of a lawsuit.' " *Sharp*, 364 Ill. App. 3d at 73-74 (quoting *Waste Management*, 144 Ill. 2d at 190). Additionally, "[t]he supreme court has also emphasized that the purpose of an insurance contract is to protect the insured against loss, damage, or liability arising from an *unknown or contingent event* and is applicable only to *some contingency or act to occur in [the] future*." (Emphases in original and internal quotation marks omitted.) *Sharp*, 364 Ill. App. 3d at 74 (quoting *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 103 (1992)). "If the insured knows that a loss will occur, it is not a contingency and would not be covered under an insurance contract absent an express agreement to do so. [Citation.] Thus, public policy would favor requiring an insured to share information with its insurer that would reveal whether a risk was known. The provisions of the insurance contract between [the insurers] and [the insured] promote these policies by requiring [the insured] to share information regarding whether its general counsel knew of particular losses. Accordingly, public policy supports enforcing the policy as written." *Sharp*, 364 Ill. App. 3d at 74.

¶ 32    In the case at bar, as noted, the insurance policy at issue is significantly different than that present in *Sharp*. The policy itself does not define a "known loss" in terms of plaintiff's general counsel's knowledge, nor does the cooperation clause expressly require plaintiff's cooperation in investigations of coverage questions. Defendants do not even acknowledge the

18

extremely different language of the policies in the two cases, despite the fact that the *Sharp* court expressly relied on the policy's language in finding that disclosure was required. Furthermore, as plaintiff notes, the coverage issue in *Sharp* was the "known loss" exclusion, while the issue in the instant case was whether there was a timely notice of occurrence. Accordingly, we find *Sharp* of limited usefulness to the instant case.

¶ 33     As noted, in the case at bar, the factual situation is quite different from that present in *Waste Management* because, here, defendants are not seeking the files of the attorneys engaged in litigation of the underlying cases, as was the case in *Waste Management*. Instead, defendants are seeking documents created well before any litigation had commenced. While "[a]ny condition in the policy requiring cooperation on the part of the insured is one of great importance [citation], and its purpose should be observed [citation]" (*Waste Management*, 144 Ill. 2d at 191), this duty is not boundless. It must remain tied to the language of the cooperation clause itself. Here, the cooperation clause requires plaintiff to "cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured." Defendants have not explained how either the CRSP documents or the S-1 documents would "assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured." Instead, defendants are seeking the documents to determine whether they can defeat plaintiff's request for coverage as a result of a late notice. Consequently, we cannot find that *Waste Management* encompasses the situation in the case at bar with respect to the cooperation clause contained in the insurance policy.

¶ 34 We are unpersuaded by the arguments raised in the dissent and in defendants' petition for rehearing concerning the applicability of a common law duty to cooperate. In its supplemental opinion upon denial of rehearing, the *Waste Management* court noted that the insureds claimed in their petition for rehearing that the language of the insurance policy at issue was different than that analyzed in the original opinion. *Waste Management*, 144 Ill. 2d at 201-02. The court found that, assuming *arguendo* that the insureds were correct, "[e]ven were the express words, 'duty to cooperate,' omitted from the contract, such a duty could reasonably be inferred based merely on principles of fairness and good faith." *Waste Management*, 144 Ill. 2d at 202. The court noted that in the case of a "cooperate-and-assist" clause, as was present in *Waste Management* and as is present in the case at bar, "the purpose of the provision is to require the insured to cooperate in good faith with the insurer in its defense of a claim." *Waste Management*, 144 Ill. 2d at 203.

¶ 35 The court further noted that typically, the insurer has limited knowledge of the facts surrounding a claimed loss, while the insured has exclusive knowledge of such facts, meaning that "[t]he insurer is, therefore, dependent on its insured for fair and complete disclosure; hence, the duty to cooperate." *Waste Management*, 144 Ill. 2d at 204. Thus, "[w]hile the insured has no obligation to assist the insurer in any effort to defeat recovery of a proper claim, the cooperation clause does obligate the insured to disclose all of the facts within his knowledge and otherwise to aid the insurer in its determination of coverage under the policy. [Citation.] The insurer is entitled, irrespective of whether its duty is to defend or to indemnify, to gain as much knowledge and information as may aid it in its investigation, or as may otherwise be significant to the insurer in determining its liability under the policy and in protecting against fraudulent claims. To hold otherwise effectively places the insurer

at the mercy of the insured and severely handicaps it in contesting a claim." *Waste Management*, 144 Ill. 2d at 204. The court found:

> "Where the insurer provides the defense it is directly involved in the generation of the defense litigation files and, obviously, has access to the whole of them. Where the insurer is bound instead to indemnify for the cost of litigation, it plays a different but no less vulnerable role in the claims process. Thus we do not believe that the insurer, as indemnifier, is relegated to a less secure position with only limited rights to disclosure. The insurer-indemnifier is no less interested or entitled to protect its financial interests and to minimize unwarranted liability claims than if it were actually participating in or providing the defense. We conclude that while the insurance contract may not, as insureds assert, expressly state that insureds have a duty to provide all information and assistance, by our interpretation of the clause no less is required." *Waste Management*, 144 Ill. 2d at 204-05.

¶ 36     Despite defendants' and the dissent's arguments otherwise, we cannot find that this language means that a common law duty to cooperate rendered the attorney-client privilege inapplicable in the instant case. As noted, the *Waste Management* analysis occurred in the context of the litigation of claims for which the insurers sought defense files. By contrast, in the case at bar, defendants are not seeking the defense files in the underlying litigation but are, instead, seeking to obtain documents that were prepared years prior to the commencement of the instant litigation. Contrary to the dissent's statement otherwise, the instant case and *Waste Management* thus do not contain remotely "similar facts." Neither the dissent nor defendants' petition for rehearing cites any authority for the proposition that an insured must disclose documents that were prepared by separate counsel years prior to any

21

litigation. Instead, both apply an expansive interpretation of *Waste Management* that strips it of the factual context in which that case was decided. Nothing in *Waste Management* suggests that it is intended to apply to situations in which an insurer is seeking prelitigation documents prepared by completely different counsel from the counsel involved in litigating the underlying claims, and we cannot interpret the case to stand for something it simply does not hold.

¶ 37                                        III. Common Interest Doctrine

¶ 38        We also find that the *Waste Management* court's discussion of the common interest doctrine is inapplicable to the instant case. In *Waste Management*, as noted, the supreme court found that "[c]learly, here both insurers and insureds had a common interest either in defeating or settling the claim against insureds in the Miller litigation. We believe that the communication by insureds with defense counsel is of a kind reasonably calculated to protect or to further those common interests." *Waste Management*, 144 Ill. 2d at 194. The court further found that "[i]nsureds and insurers share a special relationship; they are in privity of contract. In a limited sense, counsel for insureds did represent both insureds and insurers in both of the underlying litigations since insurers were ultimately liable for payment if the plaintiffs in the underlying action received either a favorable verdict or settlement. To deny discovery in this instance would be to disregard considerations of public policy which require encouragement of full disclosure by an insured to his insurer." *Waste Management*, 144 Ill. 2d at 194-95.

¶ 39        In the case at bar, however, as noted, there was no "underlying litigation" from which defendants are seeking disclosure. Instead, they are seeking documents prepared years before the first lawsuit was filed. While an insurer would certainly have an interest in

communications concerning ongoing litigation against its insured, it would be straining the *Waste Management* court's reasoning to stretch that commonality of interest to the situation that presents itself in the instant case. Consequently, we agree with plaintiff that *Waste Management* is inapplicable to the instant case.

¶ 40 We note that our decision does not necessarily mean that all of the documents withheld by plaintiff are properly shielded by the attorney-client privilege. "[I]t is the privilege, not the duty to disclose, that is the exception. [Citation.] Therefore, the privilege ought to be strictly confined within its narrowest possible limits." *Waste Management*, 144 Ill. 2d at 190. Any documents withheld by plaintiff will need to be evaluated to determine whether they are privileged, as would ordinarily be done. In other words, our decision only means that the attorney-client privilege *may* apply, not that it *does* apply to each document withheld by plaintiff. That is a question more properly considered by the trial court in the first instance, as the trial court should conduct an *in camera* examination of the documents.

¶ 41 As a final matter, we must address the dissent's confusion as to this aspect of our decision, as the dissent claims that it is "incoherent[]" and renders our opinion "what amounts to an advisory opinion." The dissent seems to believe that our task was to determine whether plaintiff "failed to meet its burden to show that the withheld documents were covered by the attorney-client privilege." However, this represents a fundamental misunderstanding of the issue on appeal. The sole issue concerning the attorney-client privilege that plaintiff raised on appeal concerns the interpretation of *Waste Management* and whether the attorney-client privilege is available at all in the context of an insurer-insured coverage dispute. See *Waste Management*, 144 Ill. 2d at 191 ("the attorney-client privilege has no application in this case"); *Waste Management*, 144 Ill. 2d at 195 ("The attorney-client

privilege simply has no application in this case."). Answering this question, our holding is that the attorney-client privilege is available because *Waste Management* does not encompass the factual circumstances present in the instant case. Neither party addresses the next question that will have to be answered, namely, "if the attorney-client privilege is available, does it apply to these documents?" Since it is not at issue on appeal and was not addressed by the parties, we likewise will not address it for the first time on appeal *sua sponte* but will leave it to the parties to argue before the trial court. This in no way renders our opinion an "advisory opinion" but simply recognizes that the trial court should make this determination in the first instance.

¶ 42     The dissent's misunderstanding of the issue on appeal is also evident by the fact that it places great significance on the idea that plaintiff has placed its compliance with the notice of occurrence provision at issue by filing a motion for summary judgment. "An implied waiver [of the attorney-client privilege] may be found when the client asserts claims or defenses that put his or her communications with the legal advisor at issue in the litigation." *Center Partners, Ltd. v. Growth Head GP, LLC*, 2012 IL 113107, ¶ 66. However, again, this is the second step of the analysis—if the attorney-client privilege is available, does it apply to these documents?—which is not the question we are asked to consider on appeal. The "at issue" exception to the attorney-client privilege simply has no bearing on the question of whether the attorney-client privilege may be asserted in an insurer-insured coverage dispute. Indeed, in *Waste Management*, the court noted that the insurers argued that the documents sought were not privileged because they were at issue in the coverage litigation but quickly dismissed the argument, finding that "the attorney-client privilege has no application in this case. Therefore, it is of no moment that the files are relevant, and further analysis of the 'at

issue' exception would only be superfluous." *Waste Management*, 144 Ill. 2d at 190-91. In other words, if the attorney-client privilege cannot be asserted at all, it is irrelevant whether the documents are at issue. Here, we have determined that the attorney-client privilege may be asserted. It will be up to the trial court to determine whether the privilege actually applies, a determination that certainly may include consideration of whether plaintiff has put the documents at issue. However, the dissent's discussion of this exception serves merely to muddy the waters of the question on appeal.

¶ 43                                   IV. *Peppers* Doctrine

¶ 44        Plaintiff also argues that the trial court's order requiring it to produce the documents is especially inappropriate because defendants are attempting to litigate facts that overlap with the facts at issue in the underlying litigation in contravention of the "*Peppers* doctrine," which was set forth by our supreme court in *Maryland Casualty Co. v. Peppers*, 64 Ill. 2d 187 (1976). Even though we have determined that the attorney-client privilege remains available to shield these documents, a discussion of plaintiff's *Peppers* argument is nevertheless useful.

¶ 45        "Under the *Peppers* doctrine, 'it is generally inappropriate for a court considering a declaratory judgment action to decide issues of ultimate fact that could bind the parties to the underlying litigation.' " *Landmark American Insurance Co. v. NIP Group, Inc.*, 2011 IL App (1st) 101155, ¶ 59 (quoting *Allstate Insurance Co. v. Kovar*, 363 Ill. App. 3d 493, 501 (2006)). "This proscription specifically precludes determination of any ultimate facts upon which liability or recovery might be predicated in the underlying case." *NIP Group, Inc.*, 2011 IL App (1st) 101155, ¶ 59. Thus, it is an abuse of discretion for a trial court in a declaratory judgment action to make such a determination. *Peppers*, 64 Ill. 2d at 196; *Empire*

*Fire & Marine Insurance Co. v. Clarendon Insurance Co.*, 267 Ill. App. 3d 1022, 1027 (1994).

¶ 46    In the case at bar, we agree with defendants that the *Peppers* doctrine is inapplicable to the instant situation. The trial court is not being asked to " 'decide issues of ultimate fact that could bind the parties to the underlying litigation.' " *NIP Group, Inc.*, 2011 IL App (1st) 101155, ¶ 59 (quoting *Kovar*, 363 Ill. App. 3d at 501). Instead, the question before the trial court is simply whether defendants are permitted to view certain documents that plaintiff claims are privileged in order to oppose plaintiff's motion for summary judgment. As defendants note, " '[t]he purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). Thus, in deciding plaintiff's motion for summary judgment, the trial court is asked only to determine whether there is a question of fact as to the issue of notice and is not asked to determine the issue of notice as a matter of law. We acknowledge that, in the future, the trial court may be asked to decide whether plaintiff provided a timely notice of occurrence. However, that is not the issue before this court today and, despite plaintiff's urging to the contrary, we will not speculate as to whether the future issues that the trial court will be asked to determine violate the *Peppers* doctrine.

¶ 47    We also note that, in situations where the *Peppers* doctrine is at issue, a court will often order a stay of the coverage litigation pending the resolution of the underlying litigation. See, *e.g.*, *Sentry Insurance v. Continental Casualty Co.*, 2017 IL App (1st) 161785 (appeal of a trial court's stay of insurance coverage litigation due to *Peppers* concerns). In the case at bar, however, neither party at oral argument indicated that it desired a stay. Furthermore, a stay

would not seem to be in the parties' best interest, as the resolution of the underlying litigation would have no effect on the late notice defense asserted by defendants, which concerns whether plaintiff timely provided notice of occurrence.

¶ 48                                    CONCLUSION

¶ 49        For the reasons set forth above, we find that the situation present in the case at bar is not encompassed by our supreme court's holding in *Waste Management*. Accordingly, the attorney-client privilege is available to shield any appropriate documents from discovery.

¶ 50        Reversed; contempt finding vacated.

¶ 51        JUSTICE LAMPKIN, dissenting.

¶ 52        I respectfully dissent. I would hold that the attorney-client privilege has no application to the discovery sought in this coverage dispute between the insured Motorola Solutions, Inc. (Motorola), and its insurers Zurich and Associated (the insurers). I disagree with the majority's conclusion that "*Waste Management* does not encompass the situation present" in this case. *Supra* ¶ 27. I would conclude, consistent with the principles of *Waste Management*, that the trial court properly granted the insurers' motion to compel the sought discovery based on (1) Motorola's duty to cooperate in accordance with the insurance policy and the principles of fairness and good faith and (2) the common interest doctrine. Although I agree with the majority's decision to vacate the contempt finding and the majority's conclusion that the *Peppers* doctrine does not apply to the discovery issue before the court, I would affirm the trial court's order that granted the insurers' motion to compel the sought discovery.

¶ 53        The majority mischaracterizes the nature and relevance of the sought discovery as documents merely "related to securities filings" (*supra* ¶ 27) or useful only to determine whether the insurers' late-notice affirmative defense can defeat Motorola's coverage claim.

To properly determine the issue on appeal, this court must consider the sought discovery within the procedural context of the challenged order granting the discovery, *i.e.*, the insurers sought the discovery about Motorola's knowledge of the risk of clean room litigation because the insurers must respond to Motorola's summary judgment motion, which argues, *inter alia*, that Motorola has complied with the notice of occurrence provisions of the insurance contracts and, thus, the insurers are obligated to pay Motorola's defense costs in the underlying clean room litigation.

¶ 54    Specifically, Motorola's declaratory relief claim against the insurers for coverage had been stayed by the trial court while this court reviewed the insurers' interlocutory appeal about the scope of settlement release agreements. Upon remand, Motorola moved the trial court to lift the stay and thereafter filed the motion for summary judgment against the insurers on their duty to pay Motorola's defense costs in the underlying clean room litigation. At the hearing on the motion to lift the stay, Motorola argued that the coverage case should proceed on Motorola's claim for defense costs but remain stayed on the insurers' coverage defenses until the underlying clean room tort actions were resolved. Motorola asserted that the trial court should decide the issue of the insurers' duty to pay defense costs now, based only on Motorola's complaint and the insurance policies, and that the insurers should litigate the factual issues concerning their late-notice defense later.

¶ 55    The insurers objected, arguing that the issue of Motorola's timely notice to the insurers was a condition precedent to coverage, extrinsic facts about any Motorola clean room liability investigation were relevant to the issue of coverage, and the insurers' late-notice issue in the coverage action overlapped with issues in the underlying clean room tort actions.

The insurers asserted it would be improper for the trial court to adjudicate any portion of the coverage issue prior to the resolution of the overlapping issues in the clean room tort actions.

¶ 56    The trial court granted Motorola's motion to lift the stay, noting that the first clean room tort action was scheduled to begin in six weeks and Motorola had moved for summary judgment against the insurers on the coverage claim. However, before the court would set a briefing schedule on Motorola's summary judgment motion, the trial court allowed the insurers time to file an Illinois Supreme Court Rule 191(b) (eff. Jan. 4, 2013) motion to obtain necessary discovery to respond to the summary judgment motion.

¶ 57    Thereafter, the insurers filed their Rule 191(b) motion and asked the court to stay the briefing and decision on Motorola's summary judgment motion. The insurers argued the *Peppers* doctrine, as set forth in *Maryland Casualty Co. v. Peppers*, 64 Ill. 2d 187 (1976), was not applicable because the court would not be adjudicating the merits of either party's claims or defenses; rather, the court would determine merely whether the insurers would get discovery before responding to Motorola's summary judgment motion. Motorola argued that the insurers must litigate their coverage defense later because they should not be allowed to prejudice Motorola by attempting to prove in the coverage action the exact same facts at issue in the underlying clean room tort actions. The trial court granted the insurers' Rule 191(b) motion and instructed the parties to draft an appropriate protective order and narrow the discovery to what the insurers needed to respond to the summary judgment motion.

¶ 58    After the trial court issued the parties' stipulated protective order, Motorola refused to produce to the insurers certain information for their response to Motorola's summary judgment motion. The insurers moved the court to compel Motorola's production, arguing they were entitled to the sought discovery based on Motorola's duty to cooperate and the

common interest doctrine. The insurers also argued that Motorola failed to carry its burden to sustain its claim that the sought discovery was privileged and protected.

¶ 59     Motorola objected, asserting that the CRSP documents were protected by the work product privilege and the S-1 documents were protected by an unspecified privilege. Motorola, however, did not provide a privilege log describing the nature of the S-1 documents that were not being produced. Motorola argued that the insurers had all the facts they needed to respond to the summary judgment motion and the protective order would not eliminate the risk of the clean room plaintiffs obtaining the privileged information. Also, Motorola claimed the sought information was irrelevant to the insurers' late notice defense because any clean room pre-litigation risk analysis by Motorola occurred dozens of years before Motorola received any notice of a clean room cause of action. Motorola asserted that if it had submitted the sought discovery for *in camera* judicial review, the trial court would agree with Motorola that the sought discovery was irrelevant to the insurers' late notice defense.

¶ 60     On March 8, 2016, the trial court granted the insurers' motion to compel because the case was "still in the discovery stage." The court explained that it would not conduct an *in camera* inspection of the documents because the stipulated protective order was in place and such an inspection would unduly burden the court's limited resources. The court stated Motorola could not "have it both ways" by claiming that any 1996 clean room litigation risk analysis by Motorola was "in anticipation of litigation" and thus privileged, while simultaneously claiming that Motorola was not aware of any risk triggering the insurance notice-of-occurrence provisions until 2007, when the clean room plaintiffs began filing their tort lawsuits.

¶ 61    Thereafter, Motorola moved the court to reconsider the order and require the insurers to respond to Motorola's summary judgment motion using the non-privileged documents available to them. The trial court denied the motion to reconsider but granted Motorola's request for a finding of non-contumacious contempt so that Motorola could obtain appellate review of the March 8, 2016, order.

¶ 62    The attorney-client privilege may be waived as to a communication put 'at issue' by a party who is a holder of the privilege. *Shapo v. Tires 'N Tracks, Inc.*, 336 Ill. App. 3d 387, 394 (2002); *Fischel & Kahn, Ltd. v. Van Straaten Gallery, Inc.*, 189 Ill. 2d 579, 585 (2000); *Waste Management*, 144 Ill. 2d at 190-91. In the present case, Motorola successfully moved, over the insurers' objections, to lift the stay in the coverage dispute and then moved for summary judgment on the issue of the insurers' duty to pay Motorola's defense costs in the underlying clean room litigation. Motorola has placed at issue in the coverage dispute and waived as to its insurers the attorney-client privilege with respect to any 1996 clean room litigation risk analysis. By asking the court to find that there is no genuine issue of material fact concerning Motorola's entitlement to payment of its clean room defense costs, Motorola asks the court to find that it has complied with the terms of the insurance contracts, including the notice of occurrence provisions, which are a condition precedent to coverage. Motorola's 1996 clean room risk analysis is not merely relevant to the dispute; rather, Motorola's compliance with the notice of occurrence provisions can only be fairly determined by disclosure of that risk analysis. See *Western States Insurance Co. v. O'Hara*, 357 Ill. App. 3d 509, 520-21 (2005).

¶ 63    In *Waste Management*, 144 Ill. 2d at 193, the court held that the attorney-client privilege did not apply to bar discovery of communications or documents created in defense of two

previously-settled lawsuits in a subsequent coverage dispute regarding one of the lawsuits. In so holding, the court looked at the insured's contractual duty to cooperate with the insurer, which was designed to protect the insurer's interests and prevent collusion between the insured and the injured party. *Id.* at 191-92, 202. The court also considered the duty to cooperate reasonably "inferred based merely on principles of fairness and good faith" (*id.* at 202), noting that the insurer typically has little or no knowledge of the facts surrounding a claimed loss and thus is dependent on its insured for fair and complete disclosure (*id.* at 204).

¶ 64     Furthermore, *Waste Management* held that the insurers' entitlement to production of the files also arose out of the common interest doctrine even though the case did not involve a situation where an attorney either provided joint or simultaneous representation to the parties or a situation where the attorney was either retained by or in direct communication with the insurer. *Id.* at 194. Although the insured and insurer were adverse to each other in the coverage litigation, they shared a common interest in defeating or settling the underlying litigation (*id.*), and the denial of discovery to the insurer in the coverage action would disregard public policy considerations "which require encouragement of full disclosure by an insured to [its] insurer" (*id.* at 195).

¶ 65     Based on a straightforward application of *Waste Management* to the instant case, I would hold that Motorola's duty to cooperate, which is based on both the broad language in the contractual cooperation clause and the principles of fairness and good faith, and the common interest doctrine render the attorney-client privilege inapplicable in the instant coverage dispute between Motorola and the insurers. I would affirm the trial court's ruling that the insurers are entitled to the sought discovery to respond to Motorola's motion for summary judgment.

¶ 66    The majority's attempt to distinguish *Waste Management* on its facts is unpersuasive. First, concerning the insured's duty to cooperate with its insurer, the majority believes there is some significance to the fact that, here, the insurers seek information created by Motorola years before the underlying clean room tort actions had commenced, whereas the insurers in *Waste Management* sought the litigation files in underlying tort actions that had already commenced. This distinction hardly serves to minimize Motorola's duty to cooperate with the insurers. Here, the issue of cooperation arises in the context of Motorola's claim that it has complied with the insurance policies' notice provisions and thus is entitled to summary judgment now on the issue of the insurers' duty to pay Motorola's defense costs in the underlying clean room litigation. Accordingly, Motorola has affirmatively placed at issue its alleged compliance with the notice of occurrence provisions, and any 1996 clean room litigation risk analysis conducted by Motorola is a relevant and necessary source of discovery for the insurers, who must respond to Motorola's motion for summary judgment. The fact that no clean room tort lawsuit had been filed when Motorola conducted the 1996 risk analysis is completely irrelevant to the court's analysis of Motorola's duty to cooperate.

¶ 67    Second, as discussed above, the majority attempts to minimize the clear relevance of the sought discovery by mischaracterizing it as mere securities filings or support for the insurers' affirmative defense to coverage. The majority then utilizes this mischaracterization to support its conclusion that such documents are not subjects included within the parties' contractual cooperation clause, which the majority erroneously believes is narrower and drastically different from the cooperation clause at issue in *Waste Management*. Specifically, the majority cites the portion of *Waste Management* that discussed the cooperation clause requirement that the insured must assist the insurers in the conduct of suits and in enforcing

any right to contribution or indemnity and "give all such information and assistance as the insurers may reasonably require." (Internal quotation marks omitted.) *Id.* at 192. The majority then contrasts this board cooperation clause language with the provision in the instant case—which requires Motorola to cooperate with the insurers and, upon request, assist them in making settlements, in the conduct of suits, and in enforcing any right of contribution or indemnity—to conclude that Motorola's contractual duty to cooperate does not even touch upon the sought discovery.

¶ 68      The majority's analysis, however, disregards *Waste Management's* supplemental opinion upon denial of rehearing, which established that the existence of the insureds' duty to cooperate with its insurers concerning the coverage dispute was not dependent upon the broad cooperation clause language cited by the majority. *Id.* at 202. Specifically, the insureds in *Waste Management* informed our supreme court that it had misapprehended the facts concerning the language of the cooperation clause, which did not include the "shall give all such information and assistance as the insurers may reasonably require" provision. (Internal quotation marks omitted.) *Id.* at 201-02. Rather, the applicable cooperation clause in *Waste Management* was essentially identical to the "insureds shall cooperate with the company" language of the cooperation clause at issue here. (Internal quotation marks omitted.) See *id.* at 202.

¶ 69      In its supplemental opinion, the court accepted as true the insureds' version of the contract terms, but concluded that even if "the express words, 'duty to cooperate,' [were] omitted from the contract, such a duty could reasonably be inferred based merely on principles of fairness and good faith." *Id.* In determining the scope of the duty, the court noted that an insurer is dependent on its insured for fair and complete disclosure because the

insurer typically has little or no knowledge of the facts surrounding a claimed loss, whereas the insured has exclusive knowledge of such facts. *Id.* at 204. Accordingly,

> "[w]hile the insured has no obligation to assist the insurer in any effort to defeat recovery of a proper claim, the cooperation clause does obligate the insured to disclose all of the facts within his knowledge and otherwise to aid the insurer in its determination of coverage under the policy. [Citation.] The insurer is entitled, irrespective of whether its duty is to defend or to indemnify, to gain as much knowledge and information as may aid it in its investigation, or as may otherwise be significant to the insurer in determining its liability under the policy and in protecting against fraudulent claims. To hold otherwise effectively places the insurer at the mercy of the insured and severely handicaps it in contesting a claim. [Citation.]" *Id*.

The majority's analysis of Motorola's duty to cooperate is inconsistent with and refuted by *Waste Management*, which determined under similar facts and essentially identical cooperation clause language that the attorney-client privilege was not applicable to bar the disclosure to the insurer of defense litigation files about the underlying litigation.

¶ 70    Third, concerning the common interest doctrine, the majority again erroneously attaches significance to the fact that the sought discovery involves Motorola's litigation risk analysis, which occurred years before any clean room plaintiffs gave Motorola notice of their cause of action. As discussed above, this fact is completely irrelevant in this discovery dispute because Motorola has placed at issue its knowledge of the risk of clean room litigation by successfully moving the trial court, over the insurers' objections, to lift the stay in the

coverage litigation and by arguing that Motorola has complied with the insurance contract provisions and thus is entitled to summary judgment on the issue of the insurers' duty to pay Motorola's defense costs. Moreover, the majority's vague analysis of the common interest issue in *supra* ¶¶ 38-40 cites no support for the proposition that *Waste Management's* common interest analysis is somehow limited to situations where the underlying litigation in a coverage dispute has commenced. *Waste Management* clearly states that in coverage disputes between insurers and their insureds, until there is a declaration to the contrary, the insurers continue to bear potential responsibility for settlement and litigation costs in the underlying action and thus the insurers and insureds have a common interest in documents generated in anticipation of minimizing liability in the underlying defense litigation. *Waste Management*, 144 Ill. 2d at 194-95, 209. Although Motorola and the insurers are now adverse concerning the issue of coverage, no such adversity exists as to the underlying litigation. See *id*. at 209.

¶ 71     Finally, after the majority concludes that *Waste Management's* duty to cooperate and common interest doctrine analysis of attorney-client privileged documents does not apply to the documents withheld here, the majority incoherently states that its "decision does not necessarily mean that all of the documents withheld by [Motorola] are properly shielded by the attorney-client privilege" and that the trial court should conduct an *in camera* examination to determine if the attorney-client privilege even applies. *Supra* ¶ 40. If the majority thinks Motorola failed to meet its burden to show that the withheld documents were covered by the attorney-client privilege, then the majority should not have issued what amounts to an advisory opinion.